IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PENNENVIRONMENT, INC. and CLEAN AIR COUNCIL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| ALLEGHENY COUNTY HEALTH DEPARTMENT, | ) ) ) | Civil Action No. 19-484 |
| Plaintiff-Intervenor, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES STEEL CORPORATION, | ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Presently before the Court are three motions for partial summary judgment, one filed by each of the parties in this matter:  Plaintiffs' Motion for Partial Summary Judgment (Docket No. 104), Plaintiff-Intervenor's Motion for Partial Summary Judgment as to Liability (Docket No. 102), and Defendant's Motion for Summary Judgment as to Plaintiffs' Claims for Injunctive Relief (Docket No. 90).  Along with these motions, the Court has considered the parties' briefs in support of and in opposition thereto, the parties' concise statements and counter statements of material facts, and the appendices filed in connection with the motions.  The Court heard oral argument on the motions on January 26, 2022.  (Docket No. 153 (Transcript of Proceedings ("Tr.")).

For the reasons set forth herein, the motions are denied.

# I.     <u>Factual Background</u>[1]

As the parties are well-acquainted with the complex factual background of this case, at this juncture the Court will present an abbreviated version of the facts relevant to the parties' motions for partial summary judgment.  Plaintiffs PennEnvironment, Inc. ("PennEnvironment") and Clean Air Council ("CAC") (collectively, the "Citizens Groups") are non-profit member-based environmental groups whose missions include promoting clean air and public health through education, advocacy, and litigation.  (Plaintiffs' and Plaintiff Intervenor's Joint Concise Statement of Undisputed Material Facts ("Plaintiffs' SMF"), Docket No. 106, ¶ 154; Declaration of Ashleigh Deemer, Docket No. 107-30; Declaration of Matt Walker, Docket No. 107-31).  The Citizens Groups bring this suit on behalf of their members.  (Docket No. 1, ¶ 1; Plaintiffs' SMF ¶¶ 155, 165, 176, 194, 207; Declaration of Edith Abeyta, Docket No. 107-32, ¶12; Declaration of Johnie Perryman, Docket No. 107-34, ¶ 12; Declaration of David Meckel, Docket No. 107-36, ¶ 11; Declaration of Cindy Meckel, Docket No. 107-37, ¶ 10; Declaration of Jonathan A. Reyes, Docket No. 107-40, ¶ 15; Declaration of Art Thomas, Docket No. 107-42, ¶ 10).

Plaintiff-Intervenor Allegheny County Health Department ("ACHD") describes itself as a local health agency organized under the Local Health Administration Law, 19 P.S. §§ 12001-12028, whose powers and duties include the enforcement of laws relating to public health within Allegheny County, including but not limited to, Article XXI of the ACHD's Rules and Regulations, Air Pollution Control Regulations (Allegheny County Code of Ordinances Chapters 505, 507 and 535) ("Article XXI").  (Complaint in Intervention, Docket No. 25, ¶ 18).

---

[1]      The relevant facts are derived from the undisputed evidence of record, and with regard to each motion, the disputed evidence of record is read in the light most favorable to the appropriate non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Defendant United States Steel Corporation ("U.S. Steel") owns and operates a group of integrated steel production facilities in Allegheny County, Pennsylvania, which include the Clairton Coke Works (the "Clairton Plant"), and two steel mills, the Irvin Plant and the Edgar Thomson Plant (collectively, the "Mon Valley Works" or the "Plants"). (Plaintiffs' and Defendant's Joint Stipulations of Fact ("JSF"), Docket No. 108, ¶ 12). The Clairton Plant is located in Clairton, Pennsylvania, the Edgar Thomson Plant is located in Braddock, Pennsylvania, and the Irvin Plant is located in West Mifflin, Pennsylvania. (*Id.* ¶ 23). At the Clairton Plant, U.S. Steel produces coke, which is used in the steel-making process. (*Id.* ¶ 25). The Irvin Plant is a secondary steel processing facility that produces steel sheets. (*Id.* ¶ 49). The Edgar Thomson Plant is an iron and steel making facility that mainly produces steel slabs. (*Id.* ¶ 51).

Coke is produced by baking coal in coke ovens, which are grouped into batteries, in a process known as "coking." (JSF ¶¶ 25-27). Coking removes impurities from coal, which generates gaseous volatile compounds known as coke oven gas or "COG." (*Id.* ¶¶ 28, 29). The ten coke oven batteries at the Clairton Plant contain a total of 708 coke ovens. (*Id.* ¶ 30). At the Clairton Plant, U.S. Steel captures the COG that it creates, treats it, and uses it as "underfire" gas to heat the coke oven batteries or as fuel for its boilers. (*Id.* ¶ 32). U.S. Steel also pipes a portion of its COG to the Irvin Plant and the Edgar Thomson Plant, where it can be used as fuel or combusted in flares. (*Id.* ¶ 33).

Under normal operating conditions at the Clairton Plant, U.S. Steel treats the COG in order to remove various pollutants before it is combusted as fuel or in flares. (JSF ¶¶ 35-37). The COG is continuously cooled and routed through equipment in areas of the Clairton Plant known as the Nos. 1, 2, and 5 Control Rooms. (*Id.* ¶ 35). Each Control Room at the Clairton Plant houses a different part of the treatment process. In the No. 1 Control Room, U.S. Steel removes ammonia,

coal tar, and naphthalene from the COG.  (*Id.* ¶¶ 36-37).  The COG is then piped to the No. 2 Control Room, where U.S. Steel removes benzene, toluene, xylene, and other constituents, and separates the COG into different gas streams, one of which has a high sulfur content.  (*Id.* ¶¶ 38-40).  U.S. Steel then pipes the high sulfur gas stream to the No. 5 Control Room, which houses a COG "Desulfurization Plant," for removal of the sulfur compounds – including hydrogen sulfide or "H2S" – and other constituents.  (*Id.* ¶¶ 40-41).

The Clairton Plant's Control Rooms operate like an old string of Christmas tree lights, so if the No. 1 Control Room is not operating, the COG cannot be treated in Control Room Nos. 2 or 5, and if the No. 2 Control Room is not operating, the COG cannot be treated in Control Room No. 5.  (JSF ¶ 45; Plaintiffs' SMF ¶ 13; Tr. at 14).  When COG containing H2S is combusted as fuel or as flares, some or all of the H2S in the COG is converted into sulfur dioxide or "SO2." (JSF ¶ 46).  SO2 is one of six criteria pollutants for which the Environmental Protection Agency ("EPA") has promulgated National Ambient Air Quality Standards ("NAAQS").  (*Id.* ¶ 48). According to Plaintiffs, SO2 emissions contribute to the formation of sulfates, particulate matter smaller than 2.5 microns in diameter ("PM2.5").  (Plaintiffs' SMF ¶ 143).  Particulate matter is also a criteria pollutant for which the EPA has promulgated NAAQS.  (*Id.* ¶ 148).

The Clean Air Act ("CAA") directs each state to develop a permit program under state or local law that meets the requirements of subchapter V ("Title V") of the CAA for review and approval by the EPA.  (JSF ¶ 13).  Title V establishes an operating permit program for certain sources of pollution, including "major sources."  *See* 42 U.S.C. §§ 7661-7661f.  ACHD issues operating permits to industrial sources in Allegheny County that are considered to be "major sources" of pollution.  (JSF ¶¶ 14-16).  *See* 40 C.F.R. Pt. 70, App. A.  ACHD's Title V Partial Operating Permit Program is codified at Article XXI of the ACHD's Rules and Regulations.  (JSF

¶ 15).  The Plants are subject to the terms and conditions of their respective Title V operating permits and installation permits.  (*Id.* ¶ 21).

The Clairton Plant, the Irvin Plant, and the Edgar Thomson Plant are all "major sources" for purposes of Title V of the CAA.  (JSF ¶ 16).  ACHD issued Title V operating permits to U.S. Steel for all three Plants, which allows U.S. Steel to operate emissions sources at each of the Plants.  (*Id.* ¶¶ 17-19).  ACHD also issued installation permits for all three Plants.  (*Id.* ¶ 20).  The Plants' permits contain H2S limits and SO2 limits.  (*Id.*; Plaintiffs' SMF ¶¶ 65, 114).  All of the permits were in effect from December 24, 2018 through June 17, 2019.  (JSF ¶ 22).

On December 24, 2018, a fire ignited in the No. 2 Control Room at the Clairton Plant (the "December Fire").  (JSF ¶ 53).  The December Fire caused significant damage to the No. 2 Control Room and the equipment inside it and resulted in the immediate shutdown of both Control Room Nos. 2 and 5.  (*Id.* ¶ 58).  The Nos. 2 and 5 Control Rooms remained shut down from December 24, 2018 until April 4, 2019 (the "Outage Period").  (*Id.* ¶ 64).  Then, on June 17, 2019, a fire occurred in the No. 1 Control Room at the Clairton Plant (the "June Fire").  (*Id.* ¶¶ 65-67).  The Nos. 1, 2, and 5 Control Rooms were taken offline for 15.92 hours on June 17, 2019 while repairs were made in Control Room Nos. 1 and 2.  (*Id.* ¶ 68).

U.S. Steel operated the Clairton Plant coke oven batteries and produced coke each day during the Outage Period and on the day of the June Fire, while the Control Rooms were not operational.  (JSF ¶ 69).  U.S. Steel also created COG on each of those days it produced coke during the Outage Period and on the day of the June Fire.  (*Id.* ¶ 70).  The COG generated at the Clairton Plant was not treated in the Nos. 2 or 5 Control Rooms during the Outage Period, or for 15.92 hours on the day of the June Fire.  (*Id.* ¶ 71).  During those times, the untreated COG was transported via pipeline to the other Plants in the Mon Valley Works, it was combusted at the Irvin

flares, and/or it was used as a fuel source at the Plants.  (*Id.* ¶ 72).  During those times when the Desulfurization Plant was not in operation, U.S. Steel mixed the COG from the Clairton Plant with natural gas and combusted the combined gas streams at certain sources at the Plants.  (*Id.* ¶ 137).

On each day during the Outage Period, continuous H2S monitors operated by U.S. Steel measured H2S in the COG created at the Clairton Plant at a daily average concentration higher than the 35 or 40 grains of H2S per 100 dry standard cubic feet ("dscf") limits set forth in its permits.  (JSF ¶¶ 78-98).  During the Outage Period, ACHD ambient air quality monitors in Allegheny County also measured ten exceedances of the EPA's daily 1-hour NAAQS for SO2 of 75 parts per billion ("ppb").  (*Id.* ¶ 99).  Additionally, during the Outage Period, ACHD's ambient air quality monitors measured a number of exceedances of the EPA's 24-hour NAAQS for PM2.5.  (*Id.* ¶¶ 100-101).  On the day of the June Fire, none of ACHD's ambient air quality monitors measured exceedances of the daily maximum 1-hour NAAQS for SO2 or the 24-hour NAAQS for PM2.5.  (*Id.* ¶¶ 106, 108).

## II.   **Procedural Background**

On April 29, 2019, the Citizens Groups filed this citizen enforcement suit against U.S. Steel pursuant to the CAA, 42 U.S.C. § 7604(a)(1).  (Docket No. 1, ¶¶ 1, 9).  The Citizens Groups allege that U.S. Steel repeatedly violated the CAA, the Pennsylvania State Implementation Plan ("SIP"), including Article XXI, and the applicable CAA operating permits at the Clairton Plant, the Irvin Plant, and the Edgar Thomson Plant.[2]  (*Id.* ¶ 3).  The Citizens Groups assert that this Court has jurisdiction over the subject matter of this action pursuant to 33 U.S.C. § 7604(a) and 28 U.S.C. § 1331.  (*Id.* ¶ 18).

---

[2]     Section 110(a) of the CAA requires each state and local air agency to adopt and submit to the EPA for approval a plan (SIP) that provides for the implementation, maintenance, and enforcement of the NAAQS for each criteria pollutant in each air quality control region within the state.  *See* 42 U.S.C. § 7410(a).  (Docket No. 1, ¶ 11).

In Count I of their Complaint, the Citizens Groups allege that U.S. Steel failed to operate pollution control equipment in violation of the conditions of its permits.  (Docket No. 1, ¶¶ 166-85).  In Count II, the Citizens Groups allege that U.S. Steel created air pollution in violation of its permit conditions at the Clairton Plant.  (*Id.* ¶¶ 186-205).  In Count III, the Citizens Groups allege that U.S. Steel violated the H2S limits in its permits at the Clairton Plant, the Irvin Plant, and the Edgar Thomson Plant.  (*Id.* ¶¶ 206-50).  In Count IV, the Citizens Groups allege that U.S. Steel violated the SO2 limits in its permits at the Clairton Plant and the Irvin Plant.  (*Id.* ¶¶ 251-345).  The Citizens Groups request various forms of relief from the Court, including that the Court declare U.S. Steel "to have violated and to be in violation of the Clean Air Act and the Plants' Title V operating permits on each of the dates and by committing each of the violations described in Counts I through IV" of the Complaint.  (*Id.* at 52).  The Citizens Groups also ask the Court to assess a penalty against U.S. Steel of "up to $97,229 per day for each violation of the Act and applicable permits and regulations."  (*Id.* at 53).  Additionally, the Citizen Groups seek various forms of injunctive relief.  (*Id.* at 52-53).

On June 25, 2019, because the Citizens Groups' suit was grounded in ACHD's federally enforceable regulations and permits, ACHD filed a Complaint in Intervention in the nature of a civil action against U.S. Steel pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and Article XXI.  (Docket No. 25, ¶¶ 1, 2).  ACHD alleges violations of the CAA, Allegheny County's portion of Pennsylvania's SIP, and U.S. Steel's federally enforceable SIP and Title V permits issued for the Clairton Plant, the Irvin Plant, and the Edgar Thomson Plant.  (*Id.*).  ACHD asserts that the Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. § 1331 and § 1355, as well as supplemental jurisdiction over the local agency law claims pursuant to 28 U.S.C. § 1367.  (*Id.* ¶¶ 3, 4).

Like the Citizens Groups' Complaint, ACHD's Complaint alleges that U.S. Steel violated the conditions of its permits.  While the substance of the allegations in the two Complaints are largely the same, ACHD presents the alleged violations in an entirely different manner than the Citizens Groups do, under three different "Claims for Relief," grouping them by total violations at each Plant.  (Tr. at 25-28).  Thus, ACHD's First Claim for Relief concerns U.S. Steel's alleged permit violations based on SO2 and H2S exceedances at the Clairton Plant.  (Docket No. 25, ¶¶ 69-80).  ACHD's Second Claim for Relief relates to U.S. Steel's alleged permit violations based on exceedances of SO2 and H2S at the Edgar Thomson Plant.  (*Id.* ¶¶ 81-92).  ACHD's Third Claim for Relief concerns U.S. Steel's alleged permit violations based on exceedances of SO2 and H2S at the Irvin Plant.  (*Id.* ¶¶ 93-104).  In its Prayer for Relief, ACHD asks the Court, among other things, to assess a penalty against U.S. Steel "for each violation of the applicable provisions of the [CAA], the Pennsylvania SIP, and U.S. Steel's Mon-Valley permits of up to $25,000 per day for each violation occurring on and after December 24, 2018."  (*Id.* at 33).  Like the Citizens Groups, ACHD also seeks several forms of injunctive relief.  (*Id.*).

On July 1, 2021, the Citizens Groups, ACHD, and U.S. Steel each filed separate motions for partial summary judgment.   The Citizens Groups and ACHD (collectively, "Plaintiffs") ask the Court to grant summary judgment in their favor as to U.S. Steel's liability for all the violations alleged in their Complaints, while U.S. Steel asks the Court to grant summary judgment in its favor as to Plaintiffs' various claims for injunctive relief.[3]  The motions have been fully briefed, oral argument has been heard, and the motions are ripe for decision.

---

[3]        In discussing U.S. Steel allegedly violating the conditions of its permits, the parties at various times use the terms "violation" or "days of violation" in their materials.  Because the parties' choice of terminology is sometimes pertinent to their arguments, and sometimes not, the Court is not hyper-technical in its word choice either, and therefore uses the terms "violation" or "days of violation" interchangeably herein.

### III.    Summary Judgment Standard and Supporting Factual Positions

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Fed. R. Civ. P. 56(c)(1)(A).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).  A disputed fact is material if it might affect the outcome under the substantive law.  *See Boyle v. Cnty. of Allegheny, Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247-48).  Summary judgment is unwarranted where there is a genuine dispute about a material fact, that is, one where a reasonable jury, based on the evidence presented, could return a verdict for the non-moving party with regard to that issue.  *See Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, the Court must draw all inferences in a light most favorable to the non-moving party without weighing the evidence or questioning the witnesses' credibility.  *See Boyle*, 139 F.3d at 393.  The movant has the burden of demonstrating the absence of a genuine issue of material fact, while the non-movant must establish the existence of each element for which it bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant has pointed to sufficient evidence of record to demonstrate that no genuine issues of fact remain, the burden is on the non-movant to search the record and detail the material controverting the movant's position.  *See Schulz v. Celotex Corp.*, 942 F.2d 204,

210 (3d Cir. 1991).  Rule 56 requires the non-moving party to go beyond the pleadings and show, through the evidence of record, that there is a genuine issue for trial.  *See Celotex v. Catrett*, 477 U.S. at 324.

Here, the Citizens Groups support their motion with a number of declarations signed by their directors and members and with excerpts from depositions of its members.  (Docket Nos. 107-30 to 107-44).  Although U.S. Steel, in its response, denies that certain facts supported by the declarations and depositions are undisputed (or material), it did not always cite to record evidence to support its denials or otherwise respond in accordance with Local Rule 56.C.1 of the Local Rules of Court for the Western District of Pennsylvania.

Local Rule 56.C.1 specifically requires that the party opposing a motion for summary judgment file a separate concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:

> a.  admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;
>
> b.  setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record . . .; and
>
> c.  setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment.

LCvR 56.C.1.

For example, in denying some statements of fact based on the Citizens Groups members' declarations, U.S. Steel repeatedly admitted only that "the referenced declarant makes various allegations in their declaration and/or deposition testimony, proof of which must be offered at

trial." (*See, e.g.,* Docket No. 122, ¶¶ 155-56). U.S. Steel also asserted that acceptance of such facts "would involve a credibility finding that cannot be made at the summary judgment stage," and noted that "significant evidence exists that is contrary to" the allegations, and that such "evidence is detailed in" U.S. Steel's opposition brief, which it "incorporated . . . by reference." (*Id.*). U.S. Steel did not always, however, cite directly to specific record evidence to show the basis for its denials. (*Id.*).

Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that declarations in support of summary judgment are properly "made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Here, the members' declarations included simple facts such as their addresses and their membership in the Citizens Groups. U.S. Steel has not come forward with any specific evidence to show that these individuals do not satisfy all three requirements of Rule 56(c)(4) with regard to these simple declarations, so the Court finds that the Rule's requirements are met regarding such declarations. Therefore, U.S. Steel's characterization of the members' declarations regarding such simple facts as requiring a credibility finding that cannot be made at the summary judgment stage, and noting that significant evidence exists that is contrary to such allegations, without appropriate reference to the record to support such a claim, is insufficient to form the basis for U.S. Steel's denial of facts based on such declarations.

The Court may deem facts to be admitted when responsive summary judgment materials have failed to comply with the Local Rules. *See Keith v. Charter Comm'ns, Inc.*, No. 18-110, 2020 WL 2394997, at *2 (W.D. Pa. May 12, 2020); *Marinkovic v. Battaglia*, Nos. 14-49 and 18-388, 2019 WL 4600207, at *2 (W.D. Pa. Sept. 23, 2019*); Harris v. Astellas Pharmaceuticals*, No. 13-1663, 2015 WL 5638023, at *1 n.1 (W.D. Pa. Sept. 14, 2015); *Jankowski v. Demand*, No. 06-

618, 2008 WL 1901347, at *1 (W.D. Pa. Apr. 25, 2008).  Here, U.S. Steel did not satisfy the Local Rules, as described, *supra*, with regard to such declarations.  Therefore, in accordance with Local Rule 56, certain facts cited by the Court herein, based on the Citizens Groups members' declarations set forth in support of Plaintiffs' SMF, and for the purpose of deciding the Citizens Groups' motion for summary judgment, will be deemed admitted where they are not specifically denied or otherwise controverted by a separate concise statement with appropriate reference to the record as described in the rules.  *See* LCvR 56.B-56.E; Fed. R. Civ. P. 56(e).

## IV.   Discussion

### A.   Plaintiffs' Motions for Partial Summary Judgment on the Issue of Liability

#### 1.   The Parties' Arguments

##### a.   The Citizens Groups' Motion

In their motion, the Citizens Groups seek partial summary judgment limited to the issue of liability, asking the Court to declare that U.S. Steel has committed a total of 12,254 days of violation of the emission standards and limitations described in Counts I, III, and IV of their Complaint.  (Docket Nos. 1; 105 at 25; 140 at 1-2).  Specifically, the Citizens Groups ask the Court to declare that U.S. Steel is liable for violating its federal operating permits and the CAA, and that it has committed the following violations: (1) 412 days of violation for failure to operate pollution control equipment under Count I; (2) 8,761 days of violation for H2S emissions at all three of the Plants under Count II; and (3) 3,081 days of violation for SO2 emissions at the Clairton Plant and the Irvin Plant under Count IV.[4]  (Docket Nos. 105 at 25; 140 at 1-2).

---

[4]     In their brief in support of their summary judgment motion, the Citizens Groups originally asked the Court to find U.S. Steel liable for 12,690 days of violation (412 days of violation at Count I; 8,761 days of violation at Count III; and 3,517 days of violation at Count IV).  (Docket No. 105 at 25).  In their reply brief and at oral argument, however, the Citizens Groups conceded that they had overcounted certain alleged SO2 violations, so they explained that the total number of violations for which Plaintiffs seek summary judgment should be reduced by 436 days. (Docket No. 140 at 1-2; Tr. at 22).  Since all of the overcounted violations concern SO2, the Court assumes that such

In support of their motion, the Citizens Groups argue that U.S. Steel's liability for such violations is clear.  They note that the SO2 and H2S emitted from U.S. Steel's Plants are harmful pollutants, that the Plants are subject to the various permits that have been issued to them, and that those permits limit the emissions of such pollutants from the Plants.  (Docket No. 105 at 4-7).  The Citizens Groups also assert that U.S. Steel does not dispute that, both during the Outage Period and after the June Fire, it exceeded its permit limits for H2S and SO2 emissions.  (*Id.* at 8-10).

The Citizens Groups further contend that their members have suffered injury in fact.  (Docket No. 105 at 10-13).  They claim that their members all live close enough to one or more of the Plants to see, smell, feel or breathe SO2, H2S, and particulate matter emitted from the Plants.  (*Id.*).  They also state that their members each suffered additional, intensified, or more frequent adverse impacts from poor air quality during the periods when U.S. Steel violated its permits, that they worried (and continue to worry) about the short-term and long-term effects of air pollution on their health, and that they are concerned that future episodes of illegal pollution will occur.  (*Id.*).

Finally, the Citizens Groups explain that U.S. Steel is strictly liable "under the citizen suit provision of the CAA . . . which allows 'any person'[5] to commence a civil suit against 'any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation.'"  (Docket No. 105 at 5 (quoting 42 U.S.C. § 7604(a)(1))).  The Citizens Groups argue that certain SO2 violations extended into May of 2019, after they had filed their Complaint in April of that year, and that U.S. Steel again violated

---

reduction in alleged violations should come from Count IV of the Citizens Groups' Complaint, which concerns SO2 emissions from the Clairton Plant and the Irvin Plant, and has adjusted the numbers accordingly.

[5]     The Citizens Groups and U.S. Steel are considered "persons" under the CAA as the term "person" includes individuals, corporations, associations, states, municipalities, and federal agencies.  *See* 42 U.S.C. § 7602(e).

permit conditions at issue in this case during the June Fire on June 17, 2019.  (*Id.* at 17).  Thus, the Citizens Groups assert that U.S. Steel "has violated" repeatedly, and was "in violation of," the emissions standards at issue here.

The Citizens Groups therefore assert that the Court should grant summary judgment in their favor and find U.S. Steel liable for a total of 12,254 days of violation.  (Docket No. 140 at 1-2).

### b. **ACHD's Motion**

Similarly, ACHD moves for partial summary judgment, asking the Court to conclude as a matter of law that U.S. Steel is liable for violations of the federal permits issued by ACHD and violations of the CAA as incorporated into Article XXI, violations which form the basis for the three Claims for Relief in ACHD's Complaint.  (Docket Nos. 25, 103).  Specifically, ACHD requests that the Court declare that U.S. Steel breached the permit conditions regarding the SO2 and H2S exceedances at Clairton Works, the Edgar Thomson Plant, and the Irvin Plant.  (Docket No. 103 at 18-19).

ACHD notes that it is unlawful for a major source to operate without or in violation of a permit issued pursuant to Title V of the CAA, and that U.S. Steel's SIP permits are also federally enforceable by ACHD under Sections 113(a) and (b) of the CAA.  (Docket No. 103 at 9 (citing 42 U.S.C. §§ 7661-7661f, 7413(a), (b))).  ACHD points out that Article XXI also provides that "'[i]nsofar as permitted by law, this Article is intended to impose absolute liability for violations of the provisions of this Article.'"  (Docket No. 103 at 10-11 (quoting Article XXI, § 2101.06(h))).  Further, Article XXI states that with regard to permit violations, "It shall be a violation of this Article giving rise to the remedies provided by Part I of this Article for any person to fail to comply

with any terms or conditions set forth in any permit issued pursuant to this Part." (*Id.* at 11 (quoting Article XXI, § 2102.03(c))).

ACHD contends that U.S. Steel undisputedly violated its permits and is responsible for the days of violation that ACHD alleges.  ACHD notes that U.S. Steel continued to operate the Plants from December 24, 2018 until April 4, 2019, as well as on June 17, 2019.  (Docket No. 103 at 5-6).  ACHD also asserts that, during the Outage Period, it recorded numerous instances where U.S. Steel exceeded its permit limits on emissions in addition to violating other regulatory requirements because of its lack of operational desulfurization equipment for its COG stream as well as the subsequent combustion of such untreated COG at operations and flares at the Irvin Plant and the Edgar Thomson Plant.  (*Id.* ¶¶ 12-18).

ACHD therefore argues that there are no genuine disputes of material fact and urges the Court to conclude as a matter of law that U.S. Steel is liable for the violations that ACHD alleges, referring the Court to a table entitled "Violations at Issue on Summary Judgment" in Plaintiffs' Joint Reply Brief in Support of Plaintiffs' Motions for Summary Judgment as to Liability.  (Docket No. 140 at 2 ("Table 1")).  The Court notes that Table 1 breaks down the alleged number of days of violation into various categories, although ACHD does not specify which days of violation in the table are tied to which of its three Claims for Relief set forth in its Complaint, nor does it clearly explain how all of the days of violation grouped in the table are tied to the explanations of the alleged violations that ACHD provided in its brief in support of summary judgment.  (Docket No. 103).  Also, as the Court previously noted, ACHD grouped the alleged violations differently than the Citizens Groups did in their Complaint, so the categories are likewise grouped differently by

claim in each Complaint.[6]  Regardless of the categorizations used, according to ACHD, U.S. Steel should be held liable for a total of 12,654 days of violation.[7]  (*Id.*).

### c.  U.S. Steel's Response

In response to Plaintiffs' motions, U.S. Steel argues that neither the Citizens Groups nor ACHD are entitled to summary judgment because there are genuine disputes of material fact that make summary judgment inappropriate here.  Specifically, U.S. Steel contends that there are material facts in dispute regarding whether the Citizens Groups have standing to challenge all of the violations they allege, as well as whether ACHD and the Citizens Groups are alleging the correct number of days of violation.

With regard to the Citizens Groups, U.S. Steel argues that, before considering whether it is liable for the violations that the Citizens Groups allege, the Court should first determine the threshold jurisdictional question of whether the Citizens Groups have standing to sue for such violations.  (Docket No. 120 at 4).  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998).  Organizations such as the Citizens Groups do not have standing to sue on behalf of their members unless the members would otherwise have standing to sue in their own right, when the interests at stake are germane to the organization's purpose, and when neither the claim asserted nor the relief requested requires participation by individual members in the lawsuit.  *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  U.S. Steel contends that it is not clear whether the Citizens Groups' members have standing to sue for all the alleged 12,254

---

[6]     Additionally, ACHD's total number of days of violation is greater than the Citizens Groups' total because ACHD includes alleged days of violation related to the Clairton Plant's "Battery C."  (Docket No. 140 at 1-2).  Those purported violations are not included in the Citizens Groups' total because the Citizens Groups' claims did not include alleged violations of the Battery C installation permit, while ACHD's claims did.  (*Id.*).

[7]     Like the Citizens Groups, ACHD concedes in reply to U.S. Steel's brief in opposition to ACHD's summary judgment motion that Plaintiffs over-counted the number of days of violation of certain limits at issue here.  (Docket No. 140 at 1).  Therefore, although ACHD does not break down the alleged days of violation by claim in its Complaint like the Citizens Groups do, ACHD reduced the total alleged days of violation from 13,090 to 12,654.  (*Id.* at 1-2).

days of violation. More specifically, U.S. Steel argues that the Citizens Groups merely claim to have standing to sue for the alleged violations "in gross," when instead they must show that they have standing to sue for each alleged CAA violation. (Docket No. 120 at 4). The Citizens Groups contend, on the other hand, that they do not need to prove a "hyper-specific" showing of standing for each violation, but rather that they need only demonstrate standing for each *claim* (comprised of multiple violations of an emissions standard) that they assert and for each form of relief that they seek. (Docket No. 139 at 10).

Additionally, in response to ACHD's motion, U.S. Steel argues that summary judgment as to its liability is inappropriate because there are several genuine disputes of material fact concerning the number of actual violations at issue. As the number of violations is relevant to both ACHD's and the Citizens Groups' motions, Plaintiffs jointly reply that some of the alleged violations are undisputed and others are supported by undisputed facts, so they are entitled to summary judgment as to liability for all of the violations that they allege.

### 2. **Legal Analysis**

#### a. **Standing Generally**

First, a brief discussion of the claims, violations, and penalties at issue in this case is in order. The CAA provides a cause of action, or a claim, against those who "have violated" an emission standard prior to commencement of a suit (if such violations are repeated), or against those who are "in violation" of an emission standard at the time a suit is commenced. *See* 42 U.S.C.§ 7604(a)(1). As explained, *supra*, the Citizens Groups argue that U.S. Steel is liable here both because its violations were repeated, and because its violations were ongoing at the time the Citizens Groups' Complaint was filed. For repeated violations, "a plaintiff must assert at least two violations of the same standard in order to allege a claim," and once that threshold is met, "there

is no ceiling on how many violations of that emission standard a plaintiff may pack into that claim." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 365 (5th Cir. 2020). Additionally, "[a] penalty may be assessed for each day of violation."  42 U.S.C. § 7413(e)(2).  In this case, the Citizens Groups contend that the penalty is capped at $97,229 per day for each violation, regardless of the number of violations in each claim.  (Docket No. 1 at 53 ("Relief Requested") (citing 42 U.S.C. § 7413(e) and § 7604(a) and (g), and 40 C.F.R. § 19.4, Table 2)). Therefore, the number of "days of violation" included within each of the Citizens Groups' claims impacts the corresponding statutory penalties that may be imposed and thus contributes towards the defined scope of each claim.

As noted, the Citizens Groups argue that they need only prove standing for each claim in their Complaint, rather than by showing that they have standing for each violation they "packed into" each claim.  In support of their position, the Citizens Groups cite to a number of cases in which standing was recognized in environmental suits without the courts engaging in separate analyses for each violation.  *See, e.g., Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 176-88 (2000) (where the defendant discharged mercury in violation of its permit from its wastewater treatment plant into a river, which the plaintiffs alleged affected their recreational, aesthetic, and economic interests); *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 791 (5th Cir. 2000) (where the defendant repeatedly violated permit limits for sulfur dioxide and hydrogen sulfide at one petroleum refinery and the organizational member plaintiffs all lived and traveled near that particular facility).  U.S. Steel argues, however, that in this case the Citizens Groups must prove standing for each violation alleged, citing the recent decision issued by the Fifth Circuit in *Environment Texas Citizens Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357 (5th Cir. 2020).

In *ExxonMobil*, a case somewhat similar to this one and one which the Citizens Groups also cite in support of their argument, the Fifth Circuit specifically held that CAA plaintiffs must prove standing for each violation alleged in support of their claims.  *See id.* at 367.  *ExxonMobil* includes significant discussion of many of the same cases cited by the parties here in support of their positions.  Notably, the Fifth Circuit explained that certain kinds of cases, in which courts did not undertake a separate standing analysis for each violation, also did not involve the number and variety of violations that were at issue in *ExxonMobil*.  *See id.* at 366.  The Fifth Circuit emphasized that "[c]itizens suits under the environmental laws typically allege injuries from discharges or emissions of one or two pollutants exceeding one or two emissions standards, all in the same manner," while, in contrast, *ExxonMobil* involved thousands of violations based on different pollutants, different types of emissions, and different injuries.  *Id.*  The Fifth Circuit further noted that, in the cases without separate standing analyses, there was no doubt that the pollutant emitted could cause the alleged injury, while the plaintiffs in *ExxonMobil* asserted "a variety of aesthetic and health-related injuries, allegedly traceable to 24 different pollutants emitted in a variety of ways (flaring, leaks, workplace accidents, etc.)," and that the "impact of those different violations varied greatly."  *Id.*  The Fifth Circuit explained that, just because the plaintiffs in those other cases repeatedly suffered the same injury resulting from a series of similar discharges, "does not mean that a plaintiff injured by one violation can automatically challenge all [of] a defendant's violations."  *Id.*  Instead, upon consideration of the number and range of violations involved in *ExxonMobil*, the Fifth Circuit concluded that "the standing inquiry is not one-size-fits all."  *Id.* Therefore, because of the variety of challenged emissions involved, the Fifth Circuit could not "say that Plaintiffs' proving standing for some violations necessarily means they prove standing for the rest."  *Id.* at 367.

Comparing the cases cited by the parties to the present case, the Court notes that, while the Citizens Groups have chosen to group their violations under only 3 claims, each of those claims is made up of hundreds – or thousands – of separate violations.  Also, like in *ExxonMobil*, the alleged violations within each claim here vary widely (*e.g.,* by emanating from three different Plants, by type of pollutant, by method or source of emission, by amount of pollutant emitted, by testing method, by length of time of emission, by permit violated, etc.).  For example, as discussed, *supra*, Count III of the Citizens Groups' Complaint alleges 8,761 days of violation based on emissions of $H2S$ from three different Plants, in different ways, at different times, in different amounts, and in violation of different permits, while Count IV alleges 3,081 days of violation for $SO2$ emissions from the Clairton Plant and the Irvin Plant, in different ways, at different times, in different amounts, and in violation of different permits.  Moreover, the Citizens Groups seek to establish standing through specified members who live in different towns, who vary in their proximity to various emissions sources, and who report an assortment of different injuries (*e.g.,* experiencing concerns about emissions from different Plants, seeing plumes, dealing with particulate matter, experiencing burning eyes, enduring smells, suffering breathing problems, etc.).

While this case differs from *ExxonMobil* in that it involves fewer types of pollutants, the Court finds that the sheer number and variety of violations alleged here render this case more like *ExxonMobil* than like the cases cited by the Citizens Groups where standing was shown in a single analysis.  Considering the allegations in the Citizens Groups' Complaint along with the evidence submitted in support of their summary judgment motion, the Court notes that each Citizens Group member does not appear to have standing to sue for every violation alleged (*i.e.,* a member who lives near one Plant may not have standing to sue for an emission from another Plant).  Nevertheless, rather than clearly showing that their various members in combination have standing

to sue for all the different violations alleged in the Complaint, the Citizens Groups argue that their members generally have overall standing to sue for all such violations.[8]

Quite simply, even if each of the Citizens Groups members' injuries are traceable to some of the alleged violations, that does not mean that they each "'possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which [they have] not been subject.'" *ExxonMobil*, 968 F.3d at 365 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)). Therefore, while it is not necessary for *each* Citizens Groups member to have standing to sue for *every* violation alleged, the Court finds that it is necessary for *some* member to have standing to sue for each violation that the Citizens Groups allege. Accordingly, the Court finds that, in this particular case, the Citizens Groups must clearly show that they – through some combination of their members – have standing to sue for each of the violations alleged in their Complaint.

The Court notes additionally that, although the Citizens Groups must prove standing for the different violations alleged in support of their claims, *separate* proof of standing is *not* required for each violation. *See Exxon Mobil*, 968 F.3d at 367. For example, courts "have allowed the same testimony to support standing for multiple violations." *Id.* Furthermore, "a factfinder may rely on circumstantial evidence and draw reasonable inferences from the evidence." *Id.* Thus, the violations alleged by the Citizens Groups can certainly be grouped together in order to show standing, so each violation clearly need not be considered one at a time, which would admittedly be an arduous process in a case such as this one which involves so many alleged violations.

---

[8]     As this case has progressed, Plaintiffs seem to have increasingly distanced their arguments from the actual claims set forth in their Complaints. As the Court has noted, the Citizens Groups and ACHD allege largely the same violations, although they each group those alleged violations in different ways, and they also refer to the violations that they themselves allege – including by asking for summary judgment as to specific numbers of violations – without clearly tying those violations back to the actual claims that they make in their respective Complaints.

Fortunately, providing clear groupings of the alleged violations in order to show that the Citizens Groups (through their various members) have standing to sue for all such violations should not be difficult in this case, particularly since the parties have already taken some efforts to group the alleged violations here for ease of consideration by the Court.

### b. Disputed Issues of Material Fact:  Citizens Groups' Standing

Having determined that the Citizens Groups must show that their members have standing to sue for the various violations alleged in their Complaint, the Court must next consider whether the Citizens Groups have shown such standing here.  In order to establish Article III standing for each violation, the Citizens Groups must show that at least one of their members:  (1) suffered an "injury in fact," that is concrete, particularized, and actual or imminent, not conjectural or hypothetical, (2) that "was likely caused by," or is "fairly traceable" to, U.S. Steel's violation, and (3) that "would likely be redressed by judicial relief."[9]  *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  While U.S. Steel does not deny that the Citizens Groups' members have suffered injuries in fact, it does challenge whether the second and third requirements of standing, "traceability" and "redressability," have been shown with regard to all of the violations alleged.

To prove "traceability" generally, plaintiffs must show that their alleged injuries are "fairly traceable to the challenged conduct of the defendant, and not the result of the independent action of some third party not before the court."  *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193 (3d Cir. 2016) (internal quotation marks and citation omitted).  In other words, the Citizens Groups must show that their members' injuries are "fairly traceable" to U.S. Steel's alleged permit violations.  In this regard, U.S. Steel argues that the Citizens Groups must show "but for" causation

---

[9]       The Citizens Groups, as the parties invoking federal jurisdiction, have the burden to demonstrate that they have standing in this matter.  *See Lujan v. Defenders of Wildlife*, 504 U.S. at 560-61.

between their members' injuries and U.S. Steel's violations.   *See LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 284-85 (3d Cir. 2021).  The Citizens Groups argue, on the other hand, that they need only show that U.S. Steel has emitted pollutants that are capable of causing or contributing to the types of injuries asserted.   *See Pub. Interest Res. Group of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990).  Alternatively, the Citizens Groups contend that they have also shown "but for" causation here.

While the parties disagree over the precise test that the Court should use to determine traceability here,[10] the Court finds that – under either of the methods proposed by the parties – genuine disputes of material fact exist as to whether the Citizen Groups members' injuries are fairly traceable to all of U.S. Steel's alleged permit violations.  As discussed, *supra*, the Citizens Groups must show that they have standing to sue for each violation alleged and, upon review of the materials submitted by the Citizens Groups in support of their motion, the Court finds that they have not shown that their members' injuries are fairly traceable to all of the violations that they allege here.  For instance, while the members' declarations include statements concerning their asserted injuries (*e.g.,* where they live and what they experienced), the Citizens Groups do not connect such statements to the specific violations alleged.  They instead assert traceability as a whole, noting that their members tie their injuries and the appearance of new injuries "directly to the violations during the Outage Period" and that their members "tie their collective injuries to the full panoply of violations."  (Docket No. 139 at 13).  Such "collective injuries" and references to "the violations during the Outage Period," however, are simply too generalized and lack the causative nexus for the Court to use in evaluating whether standing has been shown for all the

---

[10]     The parties' disagreement over the proper standard for determining "fairly traceable" is understandable, given the current state of the law on that issue.  *See Fischer v. Governor of N.J.*, 842 F. App'x 741, 754-757 (3d Cir. 2021) (Phipps, J., concurring in part and concurring in the judgment).

different types of violations that the Citizens Groups allege.  Thus, without connecting, or tracing, their members' various putative injuries to specific alleged violations, the Citizens Groups have not shown that their members' injuries are fairly traceable to all of those violations.

Moreover, because the traceability element has not been established, the Court is unable to determine whether the Citizens Groups have standing to challenge all of the days of violation that they allege, and the Court need not determine whether they have shown the last requirement of standing, "redressability," which is closely related to the "fairly traceable" requirement.  *See Powell Duffryn Terminals, Inc.*, 913 F.2d at 73.  "While the fairly traceable element focuses on the connection between the defendant's conduct and the plaintiff's injury, the redressability factor focuses on the connection between the plaintiff's injury and the judicial relief sought." *Id.*  To the extent the Citizens Groups show that their injuries are fairly traceable to U.S. Steel's violations, they will also ultimately have to show that those injuries will be "'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 39 (1976)).  Thus, to establish standing, once the Court determines whether the Citizens Groups have traced their injuries to U.S. Steel's alleged violations, the Citizens Groups will also have to demonstrate how those injuries will be redressed by the specific forms of relief that they seek here.

The Court finds that, since the Citizens Groups have not shown uncontroverted proof that their injuries are fairly traceable to all of U.S. Steel's alleged permit violations, the Court cannot, at least at this juncture, determine as a matter of law whether the Citizens Groups have shown that the relief sought will address those traceable injuries.  Accordingly, since there are genuine disputes of material fact as to whether the Citizens Groups meet all the requirements of standing, the Court cannot grant summary judgment in their favor.

### c. **Disputed Issues of Material Fact:  Number of Days of Violation**

While U.S. Steel does not challenge ACHD's standing to bring suit for permit violations, U.S. Steel does oppose ACHD's motion seeking summary judgment as to its liability for all 12,654 days of violation alleged, contending that genuine disputes of material fact exist as to whether that number of days of violation is correct.  Similarly, U.S. Steel explains in its brief that, since the Citizens Groups and ACHD both seek civil penalties for the same alleged permit violations (except for the Battery C violations, for which only ACHD seeks penalties), arguments regarding the questionable number of permit violations apply equally to the Citizens Groups' motion and ACHD's motion.  (Docket No. 121 at 4).  Accordingly, ACHD and the Citizens Groups filed a joint reply in support of both of their motions for summary judgment as to liability.  (Docket No. 140).

As explained, *supra*, in the context of a motion for summary judgment, the burden is initially on the moving party to adduce evidence illustrating a lack of genuine triable issues.  *See Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  Then, once the moving party's burden is satisfied, the non-moving party must in rebuttal present evidence sufficient to show a genuine issue in dispute.  *See Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  When considering the parties' arguments, the Court must view all facts and inferences in the light most favorable to the non-moving party, and the Court must give the benefit of the doubt to allegations of the non-party when they are in conflict with the moving party's claims.  *See Hill v. Barnacle*, 509 F. Supp. 3d 380, 385 (W.D. Pa. 2020).

Here, to show that there are no disputed issues of material fact, both ACHD and the Citizens Groups cite in their briefs to Tables attached to the Declaration of Zachary Barber, a Clean Air

Advocate at PennEnvironment, submitted in support of their motions. (Docket No. 107-16 ("Barber Tables")). Barber Table 1 is entitled "Count 1 Violations: Failure to Operate Required Equipment in Clairton Desulfurization Plant;" Barber Table 2 is entitled "Count III Violations: Violations of Daily Average Concentration Limits on Hydrogen Sulfide (H2S);" Barber Table 3A is entitled "Count IV Violations (Clairton): Violations of Sulfur Dioxide (SO2) Emissions Limits;" and Barber Table 3B is entitled "Count IV Violations (Irvin): Violations of Sulfur Dioxide (SO2) Emissions Limits." (*Id.* at 14-19). Plaintiffs argue that the Barber Tables clearly demonstrate the correct number of days of violation of U.S. Steel's permits because they are based on undisputed data. According to Mr. Barber, Barber Table 1 is based upon the days that U.S. Steel admittedly did not operate the Clairton Desulfurization Plant. (*Id.* ¶ 6). Mr. Barber also declares that Barber Table 2 is based on daily H2S concentration data for the relevant time period taken from JSF Exhibit H (the "Stipulated Table"). (*Id.* ¶ 8). Additionally, Mr. Barber declares that Barber Table 3A's SO2 emission data comes directly from the "Clairton" tab of the Stipulated Table, and that Barber Table 3B's SO2 emission data comes directly from the "Irvin" tab of the Stipulated Table. (*Id.* ¶¶ 12, 18).

While U.S. Steel does not contend that the data included in the Barber Tables cited by Plaintiffs is incorrect, U.S. Steel does dispute Plaintiffs' claim that such data clearly establishes the number of days of violation by U.S. Steel. Rather, U.S. Steel asserts that there are factual disputes as to exactly *what* such data shows with regard to the number of days of violation, and that the Court should therefore not find in favor of Plaintiffs as to U.S. Steel's liability for the specific number of days of violation that Plaintiffs claim without first weighing the parties' evidence on this issue. Upon consideration of the record available to the Court at this time, the Court agrees.

For instance, among other things, U.S. Steel disputes that the data in the Barber Tables – upon which Plaintiffs rely to show SO2 violations under U.S. Steel's Title V operating permits – is the proper type of data to use to establish SO2 violations.  U.S. Steel contends that the Plants' Title V permits specify that the appropriate method for demonstrating compliance with SO2 emission limits is through a stack test.  (Defendant's Counter Statement of Material Facts, Docket No. 122, ¶ 44).  Whereas, U.S. Steel notes, the data from JSF Exhibit H – which the Barber Tables cite as the source for such data showing the alleged SO2 emission violations – is comprised only of "estimates" that U.S. Steel created.  (Docket No. 121 at 16; JSF ¶¶ 130-32).  U.S. Steel explains that such estimates were based on assumptions and math calculations, rather than on actual emission measurements similar to what are used in stack tests.  In fact, the parties stipulated that U.S. Steel estimated SO2 emissions from sources at the Plants from December 24, 2018 through June 25, 2019 "using assumptions, including an assumption that 100% of the H2S in COG that was combusted was converted into SO2, and data it collected on COG flow rates and H2S concentrations in COG at certain monitoring points."  (JSF ¶ 130).  Furthermore, there appears to be a dispute regarding the portion of H2S that is converted to SO2 when COG containing H2S is combusted as fuel or at flares, since the parties also stipulated that they disagree as to "combustion efficiency, i.e., the portion of H2S that is converted to SO2, at the combustion points at the Plants." (*Id.* ¶ 46, n.1).[11]

Other disputed issues of material fact cited by U.S. Steel include whether Plaintiffs have aggregated certain permit limits as they should and whether they have overstated the number of

---

[11]    ACHD also briefly argues that the Court should treat the allegations contained in the Enforcement Order as admissions for purposes of this litigation.  The Court notes that ACHD does not specifically cite to that Enforcement Order in its brief, it does not cite any support for this argument, nor is there reference back to that argument in Plaintiffs' reply brief.  The Court will therefore decline to treat such allegations as admissions for purposes of the pending motions.

violations by using improper and duplicative counting methods.  In response, Plaintiffs concede that they did, in fact, fail to treat certain limits properly as aggregate limits, and thus that the number of days of violation with regard to those limits were overcounted.  (Docket No. 140 at 1-2, 10).  Plaintiffs note in their reply brief that they have adjusted the number of violations previously included in their request for summary judgment accordingly, but that there is no need to aggregate any of the remaining alleged violations.  (*Id.*).

U.S. Steel, however, maintains that Plaintiffs have miscalculated other numbers of days of violation as well, including, among other things, the alleged H2S violations based on both the 40 grains per 100 dscf limit for H2S in COG (the "40 grains H2S limit") in the Clairton Title V permit and the 35 grains per 100 dscf limit for H2S in COG (the "35 grains H2S limit") in the Clairton installation permit and the Irvin and Edgar Thomson Title V permits.  (Docket No. 121 at 6).  U.S. Steel contends that the 35 grains H2S limit in the installation permit replaced the 40 grains H2S limit in the Title V permit, and that both limits serve identical purposes, so they cannot be counted separately.  (*Id.* at 6-7).  Plaintiffs respond that, although they are entitled to include violations of both the 40 grains and 35 grains H2S limits, U.S. Steel's argument in this regard is only relevant to how violations of such limits should be penalized.  Although Plaintiffs conceded during oral argument that they would not seek penalties for such "double" violations, and although the parties indicated that they might soon agree to a stipulation regarding the 35 grains and 40 grains H2S limits dispute, no such stipulation has been submitted to the Court, so the number of violations at issue in this category remains unresolved.  (Tr. at 18-19, 48-49).

Plaintiffs also contend that this dispute is merely an issue to be ironed out at the penalty stage of this litigation, and that it is not a dispute that is relevant to their summary judgment motions.  However, as discussed, *supra*, the Court's determination of the actual number of days of

violation is an important component of conceptualizing the contours and scope of Plaintiffs' claims.  Further, Plaintiffs themselves have indicated that, in ruling on their motions for summary judgment, the Court should determine whether U.S. Steel is liable for the specific number of days of violations that Plaintiffs allege in their summary judgment materials.  (Tr. at 61).

Plaintiffs specifically ask that the Court grant summary judgment in their favor as to U.S. Steel's liability for the number of violations indicated in their respective summary judgment materials:  12,254 total days of violation under the Citizens Groups' motion, and 12,654 total days of violation under ACHD's motion.  (Docket No. 140 at 15).  However, as previously noted, the Citizens Groups and ACHD have grouped U.S. Steel's alleged violations into completely different sets of claims. The Citizens Groups allege a certain number of violations grouped into three of the four claims asserted in their Complaint, while ACHD alleges a total number of violations without assigning those violations separately to the claims in its Complaint at all.  In its brief in support of its summary judgment motion, ACHD does combine the alleged violations into various groupings, but it does not directly link those groupings to the claims in its Complaint.  (Docket No. 103). Additionally, as noted, the number of days of violation at issue in this case changed upon Plaintiffs' concession that they had overcounted certain violations, but those changes were never applied to the violation groupings initially set forth in Plaintiffs' briefs in support of summary judgment. Moreover, in a later attempt to group the alleged violations in their reply brief, Plaintiffs refer the Court to Table 1 – which breaks down the alleged days of violation into yet another set of groupings – but which, again, does not specifically refer back to either of the sets of claims asserted in Plaintiffs' Complaints. While the Citizens Groups and ACHD are certainly permitted to conceptualize and construct their respective claims differently, those differences further hinder entry of summary judgment on the current record in accord with their motions as presented.

Before the Court can rule on liability for a specific number of days of violation in this matter, the number of days of violation that Plaintiffs allege must be clearly tied to each claim asserted in each Complaint, and Plaintiffs have simply not alleged groupings of violations in such a way at this time. Therefore, at this juncture, based upon the full record before the Court, and drawing all inferences in a light most favorable to U.S. Steel as the non-moving party, the Court is unable to find that there are no genuine disputes of material fact as to U.S. Steel's liability for a specified number of violations or days of violation. Rather, the Court recognizes that – in addition to issues regarding the Citizens Groups' standing to sue for all the violations alleged, discussed, *supra* – there are issues of material fact currently in dispute regarding the number of days of violation in question here, which makes summary judgment on the issue of liability for a specific number of days of violation inappropriate. Accordingly, the motions for summary judgment filed by the Citizens Groups and by ACHD will be denied.

**B. U.S. Steel's Motion for Partial Summary Judgment as to Injunctive Relief**

Both the Citizens Groups and ACHD seek injunctive relief. The Citizens Groups' Complaint asks for various forms of injunctive relief, including that the Court order U.S. Steel to: comply with the CAA and the Plants' Title V operating permits, and refrain from further violations of the emissions standards and limitations specified in such permits; implement measures to remedy, mitigate, or offset the harm to public health and the environment caused by the violations alleged; and develop and implement a contingency plan to prevent unauthorized combustion of COG as fuel or in flares when pollution controls are inoperable. (Docket No. 1 at 52). ACHD's Complaint similarly requests that the Court permanently enjoin U.S. Steel from further violating the CAA, Pennsylvania's SIP, and the Mon Valley Works Title V permits, and order U.S. Steel to take appropriate actions to remedy, mitigate, and offset the harm to public health and the

environment caused by its violations of the CAA, Pennsylvania's SIP, and its various Mon Valley

Works permits.  (Docket No. 25 at 33).

U.S. Steel concedes that, in the course of discovery, Plaintiffs have refined their initial

requests for injunctive relief, to a certain extent, by asking that the Court order U.S. Steel to do the

following:  employ measures for hot idling all coke batteries at the Clairton Plant; address the root

causes of the fires that have caused the alleged permit violations; address the design features of

the Clairton Plant that render pollutant removal systems inoperable downstream of a breakdown

location and require U.S. Steel to continue operating its coke batteries and generating COG that

cannot be treated; and reduce the amount of COG produced when pollutant removal systems are

inoperable and reduce the amount of time that it continues to make coke (and generate COG) once

pollutant removal systems have been rendered inoperable.  (Defendant's Concise Statement of

Material Facts, Docket No. 92, ¶ 42; Plaintiffs' and Plaintiff-Intervenor's Responsive Concise

Statement, Docket No. 127, ¶ 42).  U.S. Steel notes that Plaintiffs also request that the Court

appoint a third-party monitor to address certain issues at the Clairton Plant and to oversee an

engineering audit.[12]  (Docket Nos. 92, ¶¶ 47, 50; 127, ¶¶ 47, 50).

Nevertheless, at this point in the litigation, U.S. Steel asks the Court to grant summary

judgment in its favor as to Plaintiffs' and ACHD's requests for injunctive relief.[13]  Mainly, U.S.

Steel contends that the forms of injunctive relief that Plaintiffs have requested up until this time

---

[12]    During oral argument, U.S. Steel clarified that the forms of injunctive relief that it is challenging are
Plaintiffs' requests for the following items: (1) an order that U.S. Steel comply with its Title V installation permits
and the CAA; (2) the appointment of engineering and maintenance experts to audit the Clairton Plant and make
recommendations: and (3) the appointment of a third-party monitor to oversee U.S. Steel's compliance with ordered
improvements.  (Tr. at 125-26).

[13]    Ultimately, in order to determine whether an injunction should be imposed in this matter, the Court would
have to consider whether Plaintiffs have suffered irreparable injury; whether there is an adequate remedy at law;
whether the balance of hardships tips in Plaintiffs' favor; and whether injunctive relief would be against the public
interest.  *See Ctr. for Investigative Reporting v. SE Pa. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir. 2020).

are still not specific enough to comply with Rule 65 of the Federal Rules of Civil Procedure.  *See Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 606 n.4 (10th Cir. 2008) (explaining that "the degree of specificity with which plaintiffs must describe the injunctive relief requested becomes more exacting as the litigation progresses").

U.S. Steel argues that, since its summary judgment motion challenges Plaintiffs' request for injunctive relief as being *overbroad*, to defeat that motion Plaintiffs must set forth facts that either "justify the request for a broad injunction or propose a narrower injunction."  *See Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404, 412 (6th Cir. 2016).  U.S. Steel further asserts that a proposed injunction must be specific enough to comply with Federal Rule of Civil Procedure 65(d), which provides that every order granting an injunction must: "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).

While Plaintiffs contend that their request for injunctive relief does not necessarily need to be specific enough to comply fully with Rule 65(d) at this point in the litigation, they also argue that, regardless of whether compliance with that rule is required, their request for injunctive relief is sufficiently specific and proper under Rule 65(d).[14]  (Tr. at 142-44).  The Citizens Groups point out that additional detail was added to their Complaint's more general injunctive relief request in their answer to the U.S. Steel interrogatory asking them to "[i]dentify with specificity all injunctive

---

[14]   Plaintiffs also argue, more generally, that U.S. Steel's motion is, in effect, premature in that they have not yet submitted a pretrial statement pursuant to Local Rule 16.1.C or suggested findings of fact and conclusions of law pursuant to Local Rule 52, citing *Augustin v. City of Philadelphia*, No. 14-4238, 2017 WL 56211, at *10 (E.D. Pa. Jan. 5, 2017) (holding that, when deciding whether to issue a permanent injunction, a court must determine whether "the plaintiff has actually succeeded on the merits and, if so, it must then consider the appropriate remedy").  (Docket No. 126 at 15-16).  Plaintiffs also point out that the Court is not precluded from appointing a monitor or an auditor, so a decision should not be made with regard to such requests until the Court has heard all the evidence in this matter.  *See, e.g., Maine People's Alliance v. Holtrachem Mfg. Co., LLC*, 295 F. Supp. 2d 97 (D. Me. 2003) (addressing the creation of a study panel); *Maine People's Alliance v. Holtrachem Mfg. Co., LLC*, No. 00-69, 2003 WL 22834948 (D. Me. Nov. 25, 2003) (ordering the procedure to be followed by the parties and the study panel).

relief that [Plaintiffs] seek[] in this case." (Docket No. 93-23 at 12, Interrogatory No. 4). The Citizens Groups cite their lengthy answer to such interrogatory, and they state that they further "responded by noting that the interrogatory sought information to be obtained by experts, which they would disclose (and now have disclosed) in accordance with Fed. R. Civ. P. 26." (Docket No. 126 at 7). The Citizens Groups explain that such expert reports provide additional specificity to their request for injunctive relief, and they cite various details from those reports in support of their argument. (*Id.* at 8). Furthermore, ACHD remarks that it answered the same U.S. Steel interrogatory by stating that it seeks an order directing U.S. Steel to "'develop and implement a plan for hot idling'" of coke oven batteries within 30 days of a major pollution control shutdown or ACHD enforcement order, "appropriately leaving the details of the plan to U.S. Steel's engineers and managers." (*Id.* (quoting Docket No. 93-31 at 3)). ACHD also quotes its answer to such interrogatory, including the details it provided therein regarding its request for a third-party process engineering audit, and also its request for funding for a medical facility in the area near the plant. (*Id.* at 9).

Upon consideration of the parties' arguments, the Court agrees that, in this instance, U.S. Steel's motion to deny Plaintiffs' request for injunctive relief should be denied. While the Court agrees that Plaintiffs must meet a different standard in responding to a motion for summary judgment than they would in responding to a motion filed earlier on in the case (such as a motion to dismiss), the Court does not agree with U.S. Steel's contention that Plaintiffs must show that they have fully complied with Rule 65(d) (which specifically concerns court "order[s] granting an injunction") in order to survive a motion for summary judgment. *See* Fed. R. Civ. P. 65(d)(1). Under the Sixth Circuit's reasoning in *Perez* (upon which U.S. Steel relies), in considering a motion for summary judgment as to injunctive relief, "[t]he responding party must furnish facts in

accordance with Rule 56's standards that justify the request for a broad injunction or propose a narrower injunction in keeping with the facts of the case viewed in the light most favorable to the non-movant."  655 F. App'x at 412.  And as the Tenth Circuit explained in *Shook* in the context of class certification (a case cited by both Plaintiffs and U.S. Steel), a motion must be sufficiently specific "to allow the district court to see how it *might satisfy* Rule 65(d)'s constraints."  543 F.3d at 605 n.4 (emphasis added).

Accordingly, upon consideration of the evidence that Plaintiffs have supplied in response to U.S. Steel's motion, the Court finds that Plaintiffs have shown that they have sufficiently specified their request for injunctive relief in keeping with the facts viewed in the light most favorable to them, such that the Court can see how an order granting Plaintiffs' request for injunctive relief, to some extent at least, might satisfy Rule 65(d)'s standards.  Thus, the Court concludes that Plaintiffs' request for injunctive relief is not clearly non-compliant with Rule 65, as U.S. Steel argues.  *See, e.g., Burton v. City of Belle Glade*, 178 F.3d 1175, 1200-01 (11th Cir. 1999) (holding that a proposed injunction simply ordering the city not to discriminate in future annexation decisions would not satisfy the specificity requirements of Rule 65(d) and would be incapable of enforcement); *Liss v. Jacksonville Aviation Auth.*, No. 19-185, 2019 WL 3717942, at *4 (M.D. Fla. Aug. 7, 2019) (ruling, on a motion to dismiss, that a requested order only enjoining the defendants from "continuing to act in violation of federal and state law" was not available because its language did no more than direct the defendants to obey the law, which fails to meet the requirements of Rule 65(d) and is incapable of enforcement).  Rather, the Court finds that Plaintiffs' request for injunctive relief, or some portion thereof, does not merely direct U.S. Steel to obey the law, but it may, rather, satisfy the requirements set forth in Rule 65 once the Court has heard all the evidence and resolved the disputed issues of material fact – particularly since, as the

parties agree, the Court ultimately has authority to craft appropriate relief here.  (Tr. 149-50).

Additionally, as the Court has separately found that there are a number of issues of material fact

in dispute in this matter, *see* discussion, *supra*, the Court further notes that such issues are also

directly relevant to, and bear directly upon, the proposed injunctive relief that Plaintiffs have

requested.  Until all such disputed issues are resolved, the Court will not rule out injunctive relief

(or its specific nature) as part of a potential remedy in this case.

Therefore, at this time and upon the record presently before it, the Court is unable to make

a determination that Plaintiffs' request for injunctive relief cannot be enforced or justified

consistent with Rule 65(d).  While the parties have engaged in discovery and have reviewed all

the relevant evidence in this case, the Court has not yet heard all such evidence nor made any

factual findings.  (Tr. 151).  Because decisions regarding the relief to be awarded in this case

should be properly made by the Court after it has heard all the relevant evidence and resolved all

disputed issues of material fact, and because the Court has not yet been presented with sufficient

evidence to make its decision on the issue of injunctive relief nor has it resolved all disputed

material issues of fact, U.S. Steel's motion will be denied.

Additionally, with regard to the Citizens Groups alone, U.S. Steel argues that they have

not shown that they have standing to seek injunctive relief because they have not identified specific

projects that would redress their asserted injuries.  Here, too, in the context of standing, the Court

finds that it would be premature to determine at this time that the type of relief requested is not

specific enough for the Citizens Groups to show that it will redress their injuries.  Furthermore,

because the Court finds that the Citizens Groups have not yet shown that their injuries are fairly

traceable to all of the alleged violations of U.S. Steel (*see* discussion, *supra*), it would be

inappropriate, at this juncture, for the Court to jump ahead in its analysis to determine whether the

Citizens Groups have shown the redressability element of standing with regard to individual injunctive remedies.

Therefore, U.S. Steel's motion for summary judgment as to Plaintiffs' request for injunctive relief will be denied.

## V.    <u>**Conclusion**</u>

Based on the foregoing, the Citizens Groups' motion for partial summary judgment as to liability, ACHD's motion for partial summary judgment as to liability, and U.S. Steel's motion for partial summary judgment as to injunctive relief are all denied.

An Order consistent with this Memorandum Opinion follows.


Dated: March 31, 2022                             *<u>s/ W. Scott Hardy</u>*
                                                  W. Scott Hardy
                                                  United States District Judge

cc/ecf:  All counsel of record