IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

PENNENVIRONMENT, INC. and
CLEAN AIR COUNCIL,

      Plaintiffs,

and

ALLEGHENY COUNTY
HEALTH DEPARTMENT,

      Plaintiff-Intervenor,

      vs.

UNITED STATES STEEL
CORPORATION,

      Defendant.

Civil Action No. 2:19-cv-00484

---

## CONSENT DECREE AND ORDER

Upon consideration of the Motion for Entry of Consent Decree and Order filed by the Parties, the Court finds as follows:

A.     Defendant United States Steel Corporation ("U. S. Steel") operates the Clairton Plant, the Edgar Thomson Plant, and the Irvin Plant (the "Facilities").

B.     Following service of a February 13, 2019, notice letter as required by 42 U.S.C. § 7604(b)(1)(A), Plaintiffs PennEnvironment, Inc. and Clean Air Council (collectively, "Plaintiffs") filed a Complaint in this action pursuant to Section 304 of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. § 7604, alleging that the Facilities violated the CAA, the Allegheny County portion of the Pennsylvania State Implementation Plan ("SIP"), and certain Title V Operating Permits and

Installation Permits issued by the Allegheny County Health Department (the "Department" or "ACHD") for the Facilities.

     C.     Plaintiff-Intervenor Allegheny County Health Department filed a Complaint in Intervention in this action pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b) and 28 U.S.C. § 1367, alleging that the Facilities violated the CAA, Article XXI of the Department's Rules and Regulations, and certain Title V Operating Permits and Installation Permits issued by ACHD for the Facilities.

     D.     U. S. Steel does not admit any liability arising out of any allegations made by Plaintiffs or ACHD, and nothing in this Consent Decree shall be construed to be an admission of liability by U. S. Steel regarding any of the matters addressed herein.

     E.     The Parties recognize, and the Court finds by entering this Consent Decree, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

     NOW, THEREFORE, with the consent of the Parties, without the adjudication or admission of any issue of fact or law except as provided in Section I (Jurisdiction and Venue), IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I. <u>JURISDICTION AND VENUE</u>

     1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367 and Sections 113(b) and 304 of the Act, 42 U.S.C. §§ 7413(b) and 7604, and over the Parties. Venue lies in this District pursuant to 42 U.S.C. §§ 7413(b) and 7604(c) and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged in the Complaint and Complaint in Intervention are alleged to have occurred in, and U. S. Steel conducts business in, this judicial district. For purposes of this Consent Decree, or any action to enforce this Consent Decree, the Parties consent to the Court's jurisdiction over this Consent Decree and any such action, as well as to venue in this judicial district.

2.      For purposes of this Consent Decree, U. S. Steel agrees that the Complaint and Complaint in Intervention state claims upon which relief may be granted pursuant to Sections 113 and 304 of the CAA, 42 U.S.C. §§ 7413 and 7604.

## II. **APPLICABILITY**

3.      The obligations of this Consent Decree are binding upon the Parties, any of their successors or assigns, or other entities or persons otherwise bound by law. Any change in ownership, corporate status, or other legal status of U. S. Steel shall in no way alter U. S. Steel's responsibilities under this Consent Decree.

4.      U. S. Steel shall condition any transfer, in whole or in part, of ownership of, operation of, or other interest in (exclusive of any non-controlling, non-operational shareholder interest) any of the Facilities upon the execution by the transferee of a modification to this Consent Decree, which makes the applicable terms and conditions of the Consent Decree applicable to the transferee. In the event of such transfer, U. S. Steel shall notify Plaintiffs and ACHD in accordance with Section XIV (Notices).  No earlier than 30 days after such notice, U. S. Steel may file a motion to modify this Consent Decree with the Court to make the terms and conditions of the Consent Decree applicable to the transferee. Only upon transferee's full assumption of all outstanding terms, conditions and obligations of the Consent Decree shall U. S. Steel be released from the obligations and liabilities of this Consent Decree, unless Plaintiffs or ACHD oppose the motion and the Court finds the transferee does not have the financial and technical ability to assume the applicable obligations and liabilities under this Consent Decree.

5.      U. S. Steel shall provide a copy of this Consent Decree to all officers, directors, employees, agents, and contractors whose duties might reasonably include compliance with any provision of this Consent Decree.

6.      In any action to enforce this Consent Decree, U. S. Steel shall not raise as a defense the failure of any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III. DEFINITIONS

7.      Terms used in this Consent Decree that are defined in the CAA or in Article XXI of ACHD's Rules and Regulations have the meaning set forth in the CAA or Article XXI unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

"24-Hour Average" means the arithmetic average of hourly average concentrations of hydrogen sulfide in COG, represented in units of grains per hundred dry standard cubic feet of COG, over a Calendar Day.

"ACHD" or "Department" means the Allegheny County Health Department.

"Battery 15" means Coke Oven Battery 15 as identified in Section V.C. of Major Source & Federally Enforceable State Operating Permit No. 0052-OP22, issued by ACHD on November 21, 2022, under source ID P009.

"Boiler" means any of the following sources as identified in Major Source & Federally Enforceable State Operating Permit No. 0052-OP22 issued by ACHD on November 21, 2022: Boiler No. 1 (source ID B001); Boiler No. 2 (source ID B002); Boiler R1 (source ID B005); Boiler R2 (source ID B006); Boiler T1 (source ID B007); Boiler T2 (source ID B008).

"Bypass of Control Room 2" means the diversion, for any reason and for any amount of time, of the flow of COG containing greater than 25 grains hydrogen sulfide per hundred dscf to a point downstream of Control Room 2 without that COG being treated by equipment within Control Room 2.

"Bypass of Control Room 5" means the diversion, for any reason and for any amount of time, of the flow of COG containing greater than 25 grains hydrogen sulfide per hundred dscf to a

4

point downstream of Control Room 5 without that COG being treated by equipment within Control Room 5.

"CAA" means the Clean Air Act, 42 U.S.C. § 7401 et seq.

"Calendar Day" means the period of elapsed time that begins at midnight on a certain date and ends 24 hours later at midnight of the next day.

"Calendar Day of Shutdown or Bypass" means any Calendar Day on which Control Room 2 or Control Room 5 experiences a Shutdown or on which there is a Bypass of Control Room 2 or Bypass of Control Room 5, that results in an exceedance of the 25 Grains Limit (as set forth in Paragraph 13).

"Clairton Plant" means U. S. Steel's Clairton Coke Works, located at 400 State Street, Clairton, PA 15025, and currently operated pursuant to Major Source & Federally Enforceable State Operating Permit No. 0052-OP22, issued by ACHD on March 27, 2012, and last amended November 1, 2022.

"COG" means coke oven gas generated from the destructive distillation of coal in coke ovens at the Clairton Plant.

"Consent Decree" means this Consent Decree and Order and all appendices attached hereto, as entered or approved by the Court.

"Control Room 1" means the area of the Clairton Plant that is upstream from Control Rooms 2 and 5 and houses equipment responsible for removing ammonia, coal tar, naphthalene, and other constituents from COG.

"Control Room 2" means the area of the Clairton Plant that is downstream of Control Room 1 and upstream of Control Room 5 and houses equipment responsible for removing light oil, benzene, toluene, xylene, and other volatile constituents, and for separating COG into different gas streams.

"Control Room 5" means the area of the Clairton Plant that is downstream of Control Rooms 1 and 2 and houses the Desulfurization Plant, identified as process ID P019 in Major Source & Federally Enforceable State Operating Permit No. 0052-OP22, issued by ACHD on November 21, 2022, and which is principally responsible for removing sulfur compounds from some of the COG following treatment at Control Rooms 1 and 2.

"Court" means the United States District Court for the Western District of Pennsylvania.

"December Fire" means the fire that occurred at Control Room 2 on December 24, 2018.

"Dscf" means dry standard cubic feet.

"Edgar Thomson Plant" means U. S. Steel's Edgar Thomson Plant, located at 13th Street and Braddock Avenue, Braddock, PA 15104, and currently operated pursuant to Major Source & Federally Enforceable State Operating Permit No. 0051a, issued by ACHD on April 13, 2016 and last amended on June 21, 2019.

"Effective Date" means the date upon which the approval of, or grant of motion to enter, this Consent Decree is recorded on the Court's docket.

"Equivalent Stringency" means equivalency of a potential COG hydrogen sulfide limit to an existing limit in terms of the number of grains of hydrogen sulfide per hundred dscf COG (e.g., 25 grains per hundred dscf COG), the frequency at which compliance with the limit is determined (e.g., once per Calendar Day), the averaging time(s) used to determine compliance (e.g., a 24-hour average), and the monitoring or testing methods used to determine compliance (e.g., through a continuous hydrogen sulfide monitor).

"Facilities" means the Clairton Plant, Edgar Thomson Plant, and Irvin Plant, collectively.

"Irvin Plant" means U. S. Steel's Irvin Works, located at Camp Hollow Road, West Mifflin, PA 15122, and currently operated pursuant to Major Source & Federally Enforceable State Operating Permit No. 0050-OP16c, issued by ACHD on December 9, 2016.

"July Incident" means the incident that occurred at the Clairton Plant on July 4, 2022, that rendered the No. 1, 2, and 5 Control Rooms temporarily inoperable due to a power outage.

"June Incident" means the electrical arcing incident that occurred at Control Room 1 on June 17, 2019, that rendered the No. 1, 2, and 5 Control Rooms temporarily inoperable.

"Parties" means U. S. Steel, ACHD, PennEnvironment, and Clean Air Council, collectively.

"Party" means U. S. Steel, ACHD, PennEnvironment, or Clean Air Council, individually.

"Permanent Idling" means U. S. Steel's full implementation of measures that permanently cease the charging of coal, production of coke, and the combustion of fuel at Battery 15.

"Plaintiffs" means PennEnvironment and Clean Air Council, collectively.

"Shutdown" means the cessation of operation of Control Room 2 or Control Room 5 for any reason and for any amount of time.

"Sulfur Dioxide Primary NAAQS" means the national primary 1-hour annual ambient air quality standards for sulfur oxides (sulfur dioxide) as established at 40 C.F.R. § 50.17.

"Tons of Sulfur Dioxide Emissions" means the calculated amount of emissions of sulfur dioxide collectively emitted from all sources at the Clairton Plant, Irvin Plant, and Edgar Thomson Plant from combustion of COG during a Calendar Day of Shutdown or Bypass, determined by converting the hydrogen sulfide grain loading of the fuel burned and the fuel flow rate to pounds per hour of sulfur dioxide (assuming 100% combustion of hydrogen sulfide).

"Written Demand" means a letter or e-mail sent by ACHD to U. S. Steel demanding that U. S. Steel pay stipulated penalties pursuant to Section VII (Stipulated Penalties) of this Consent Decree. The Written Demand shall contain the following information, as appropriate: (1) the amount of stipulated penalties demanded, including any NAAQS-related enhancements thereto; (2) the alleged dates on which U. S. Steel incurred stipulated penalties and what dates, if any, an exceedance of the Sulfur Dioxide Primary NAAQS was measured; and (3) the basis of ACHD's

calculation of stipulated penalties and any enhancements thereto, including any supporting data or records.

## IV. **COMPLIANCE REQUIREMENTS**

8.    <u>Implemented Improvements and Upgrade Projects</u>.   U. S. Steel implemented the following system improvements, equipment upgrades, and changes to its operating and maintenance procedures after the December Fire, at a combined cost of over $17.5 million:

a.    Installation of real-time vibration detection equipment for axi compressors in Control Rooms 1, 2, and 5;

b.    Implementation of fire and sprinkler system repairs to Control Room 2;

c.    Reconfiguration of axi compressor trip logic in Control Room 2;

d.    Implementation of daily vibrational monitoring by a third-party specialist;

e.    Operation of additional axi compressors at the sulfur plant;

f.    Performance of additional dye penetrant testing for axi compressor rotors;

g.    Repair of suction inlet isolation gate valves;

h.    Replacement of cooling tower water system piping and valves;

i.    Replacement of injection water piping and valves;

j.    Replacement of sub square suction piping and valves;

k.    Replacement of discharge piping and valves;

l.    Replacement of High Bay lighting, and installation of strobe lights and audible alarms to vacuum compressor building;

m.    Replacement of roof, roof exhaust fans, and wall fans for Control Room 2;

n.    Replacement of all lube oil pumping mechanisms for Control Room 2;

o.    Installation of an additional eductor at Control Room 2 underfire jet gas station;

p.    Installation of new alarm override button in Control Room 2 gas panel;

q. Installation of manual pull station at control panel in Control Room 2;

r. Installation of emergency stop control stations to each Vacuum Compressor Graphic Panel;

s. Replacement of the transformer involved in the June Incident and installation of a 5 kV switchgear;

t. Performance of thermographic imaging of electrical breakers, transformers, and related equipment.

9. <u>Third-party review and risk assessment of Clairton Plant</u>. As part of U. S. Steel's ongoing loss prevention and fire protection initiatives, U. S. Steel regularly commissions a third-party to conduct risk evaluations for the Clairton Plant for insurance purposes. In 2022, this risk evaluation assessed the potential impact of property damage to, among other things, Control Rooms 1, 2, and 5; the electrical supply system at the Clairton Plant; and the COG pipelines to the Irvin and Edgar Thomson Plants (the "Risk Evaluation"). The Risk Evaluation assessed: the use of noncombustible construction materials; fixed fire protection and detection systems in place at the Clairton Plant; the dedicated on-site fire department; property loss prevention and control management programs; and the redundancy of process equipment. The Risk Evaluation also assessed improvements that U. S. Steel made to the reliability of axial compressor operation in Control Room 1, the electrical supply, and production equipment at the Clairton Plant following the December Fire and June Incident. These include, but are not limited to, adding spare axial compressors for Control Rooms 1 and 2, breaker and relay testing improvements, installation of several new fire detection systems, and installation of ultraviolet/infrared video detection monitoring in Control Room 1.

10. <u>Permanent Idling of Battery 15</u>. By December 31, 2023, or six months after the Effective Date of this Consent Decree (whichever is later), U. S. Steel shall complete the

Permanent Idling of Battery 15 and shall promptly notify Plaintiffs and ACHD in writing that this project has been completed.

    a.    Within 30 days of the Permanent Idling of Battery 15, U. S. Steel shall apply to ACHD to remove Battery 15 as an emission source from all of its effective CAA permits.

    11.   <u>Control Room Upgrade Projects</u>.  U. S. Steel shall complete the following two projects, which are estimated to collectively have an approximate cost of $19.5 million:

    a.    *Control Room 5 Axi Compressor Redundancy*.  In addition to the two steam-powered axial compressors currently installed at Control Room 5, U. S. Steel shall, no later than December 31, 2024, install a third, electric-powered, axial compressor to provide backup compression when either one of the axial compressors is shut down or non-operational due to maintenance activities, or if there is a loss of steam to power the steam-powered axial compressors.

    b.    *Control Room 1 High Pressure Steam Redundancy*.  U. S. Steel shall implement upgrades to an existing Boiler of its choosing at the Clairton Plant to enable the Boiler to produce high-pressure steam sufficient to operate the PHOSAM Plant within Control Room 1, so as to serve as a backup source of high-pressure steam for Control Room 1.  U. S. Steel shall perform such Boiler upgrades within two years after receipt of a final installation permit from the Department, if needed to authorize the Boiler upgrades, or by December 31, 2025 (whichever is later).  No later than 30 days following the Effective Date, U. S. Steel shall submit to ACHD a Request for Determination as to whether a permit is required for this project.  ACHD shall respond to U. S. Steel's Request for Determination within 90 days of receipt.   In the event that a permit is required, (*i*) U. S. Steel shall submit an administratively complete permit application no later than 90 days after the date of ACHD's determination that a permit is required for this project, and (*ii*) the deadline for completing this project will be automatically extended by the amount of time equal to the number of days that the issuance and receipt of the final installation permit from the Department (or any other air permitting authorization) exceeds 6 months after the submittal of an

administratively complete application by U. S. Steel, plus the amount of time any permit or authorization remains under appeal. ACHD shall make a completeness determination as to U. S. Steel's permit application within 60 days of receipt.

      c.      Beginning six months after the Effective Date, and every six months thereafter until the Control Room 5 Axi Compressor Redundancy and Control Room 1 High Pressure Steam Redundancy projects are completed, U. S. Steel shall provide written status reports to the Plaintiffs and ACHD regarding the progress made in completing the two projects. Upon completion of each project, U. S. Steel shall provide written certification thereof to the Plaintiffs and ACHD, and will no longer be obligated to submit status reports.

12.  In the event that U. S. Steel seeks not to complete either the Control Room 5 Axi Compressor Redundancy project or Control Room 1 High Pressure Steam Redundancy project:

      a.      U. S. Steel shall provide to the Plaintiffs and ACHD, in writing and no later than six months prior to the completion date for that project specified in Paragraph 11, (*i*) an explanation of why the project should not be completed, including an analysis of any impact on Control Room reliability resulting from failure to complete the project, and (*ii*) a proposal for an alternative project or projects that achieve equivalent or better reliability or environmental performance of the Control Rooms, including an estimate of approximate cost. Approval of any such alternative project(s) by ACHD is required for U. S. Steel to be relieved of its obligation to complete the original project. Such approval by ACHD may be granted if the alternative project(s) are demonstrated, to the satisfaction of ACHD, to achieve equivalent or better reliability or environmental performance of the Control Rooms. ACHD shall consult with Plaintiffs in connection with approving any such alternative projects, but ACHD shall have final decision-making authority. Each alternative project(s) shall be subject to the reporting requirements specified in Paragraph 11.c. U. S. Steel's written certification upon completion of the alternative

project(s) shall include a summary of expenditures sufficient to document the final cost of the alternative project(s).

b. If the final cost of the alternative project(s) approved under Paragraph 12 is less than the anticipated cost of the original project set forth in Paragraph 11, U. S. Steel shall make an Additional Settlement Payment equivalent to the difference between the final cost of the alternative project(s) and the anticipated cost of the original project. ACHD shall provide a written demand for this Additional Settlement Payment within 30 days of U. S. Steel's written certification that it completed the alternative project(s). This Additional Settlement Payment shall be payable as set forth in Paragraph 15, and may be paid in equal annual installments as an addition to any remaining payments due under Paragraph 15.

13.     COG Hydrogen Sulfide Limit

a.     As of the Effective Date, all COG flared, mixed, or combusted at the Facilities shall contain concentrations of sulfur compounds, measured as hydrogen sulfide, as determined by U. S. Steel and reported to ACHD using the methodology required and implemented by ACHD pursuant to Article XXI, effective February 5, 2023, of no more than 25 grains of hydrogen sulfide per hundred dscf COG based on a 24-Hour Average (the "25 Grains Limit").

b.     Through this Consent Decree, ACHD acknowledges that it will, upon application by U. S. Steel, delete all other hydrogen sulfide standards for COG established for the Facilities in their respective CAA permits that are higher than 25 grains, and replace them with the 25 Grains Limit for each of these facilities. In addition, ACHD agrees to undertake rulemaking and promulgate revisions to its Article XXI Rules and Regulations to establish the 25 Grains Limit in lieu of higher hydrogen sulfide concentration limits for COG applicable to the Facilities.

c.     Notwithstanding Paragraphs 13.a and 13.b, in the event that there is a reduction to the Sulfur Dioxide Primary NAAQS, amendments to the Pennsylvania SIP (not including the Allegheny County portion), or implementation of or revision to other applicable

12

federal or Pennsylvania statewide laws or regulations reducing limits on hydrogen sulfide concentration in COG, the Department shall not be prohibited from subsequently promulgating a limit on hydrogen sulfide concentration in COG lower than established in Paragraph 13.a, only to the extent that the lower limit is shown to be technologically feasible and reasonably demonstrated (considering all information required under any applicable laws or regulations, including but not limited to 40 C.F.R. Part 51, to be included in a SIP submission) to be necessary for Allegheny County to attain the revised Sulfur Dioxide Primary NAAQS or required to achieve Equivalent Stringency to applicable federal or Pennsylvania statewide regulations on hydrogen sulfide concentration in COG.

## V.  CIVIL PENALTY

14.     Within 30 days after the Effective Date of this Consent Decree, U. S. Steel shall pay a civil penalty to ACHD in the amount of $500,000.  Payment shall be made in accordance with instructions provided by ACHD and via wire transfer or another method agreed-to by U. S. Steel and ACHD, payable to "Allegheny County Clean Air Fund."

## VI.  ADDITIONAL SETTLEMENT PAYMENT

15.     U. S. Steel shall pay an additional sum of $4,500,000 (the "Additional Settlement Payment") as part of the settlement reached to conclude this litigation.  One-half (50%) of the Additional Settlement Payment shall be paid to the Jefferson Regional Foundation ("JRF") and one-half (50%) shall be paid to Allegheny County through the Allegheny County Department of Economic Development ("ACED") (each a "Recipient," collectively, the "Recipients"). The first of five equal annual installments to be paid to each Recipient shall be paid within 30 days after the Effective Date, and the following annual installments shall be made within 30 days of the annual anniversary of the Effective Date, continuing until all $4,500,000 of the Additional Settlement Payment has been disbursed.  The Additional Settlement Payment shall be paid to the Recipients in accordance with instructions to be provided to U. S. Steel by each Recipient. Each Recipient's

receipt of the Additional Settlement Payment shall be conditioned on using the funds exclusively to fund Mon Valley-based projects supporting public health and welfare and/or air quality improvement in Mon Valley communities located near the Facilities, according to the following requirements:

      a.    The Recipients shall each agree, as a condition of receiving any funds pursuant to Paragraph 15 of this Consent Decree:

      i.    to represent that it is a 501(c)(3) tax-exempt entity (in the case of JRF) or the lead economic and residential development agency for Allegheny County (in the case of ACED);

      ii.    to solicit proposals from and disburse grants to 501(c)(3) tax-exempt entities exclusively to fund Mon Valley-based projects supporting public health and welfare and/or air quality improvement in Mon Valley communities located near the Facilities, or, in the case of ACED, to allocate any funds to its own projects only in compliance with the requirements of Paragraph 15(b) of this Consent Decree.

      iii.    not to distribute any money received under this Consent Decree for advocacy or political lobbying activities;

      iv.    not to distribute any money received under this Consent Decree to any entity that has ever been or is involved in litigation in support of or against U. S. Steel;

      v.    not to distribute any money received under this Consent Decree for a project employing and/or utilizing the services of any person who has ever served as a testifying or non-testifying expert in support of or against U. S. Steel;

vi.    that it shall require all entities that receive funds pursuant to this Consent Decree to covenant and agree that (1) the entity is a 501(c)(3) tax-exempt entity; (2) the entity is requesting funds for purposes unrelated to pursuing, supporting, or otherwise facilitating litigation; (3) the entity has never been and is not involved in litigation in support of or against U. S. Steel; (4) the entity is not requesting funds for the purposes of advocacy or political lobbying activities; (5) the entity will not employ and/or utilize the services of any person who has ever served as a testifying or non-testifying expert in support of or against U. S. Steel in connection with a project funded pursuant to this Consent Decree; and (6) to the extent the entity fails to abide by any of these conditions, it shall immediately repay all funds received pursuant to this Consent Decree for the project in question to the Recipient and henceforth be ineligible to receive additional funds pursuant to this Consent Decree; and

vii.    to provide the Parties with a report on the first anniversary of receiving the funds and on each anniversary thereafter until the funds are expended, certifying that the funds were used in accordance with the terms of this Consent Decree.  In the case of a failure by either Recipient to provide the above certification, or if all funds are not fully distributed by either Recipient within three years of the date of its receipt of the final annual installment from U. S. Steel, the Parties reserve their right to seek an order directing that

Recipient to pay the remaining funds to the Allegheny County Clean Air Fund.

b.     ACED shall also have the authority to propose its own projects for funding out of the Additional Settlement Payment and shall agree, as a condition of receiving any funds pursuant to Paragraph 15 of this Consent Decree, that said projects:

      i.     are Mon Valley-based projects supporting public health and welfare and/or air quality improvement in Mon Valley communities located near the Facilities;

      ii.     are unrelated to advocacy or political lobbying activities;

      iii.     will not be performed in collaboration with any organization that has ever been or is involved in litigation in support of or against U. S. Steel;

      iv.     are unrelated to the pursuit, support, or facilitation of litigation;

      v.     will not employ and/or utilize the services of any person who has ever served as a testifying or non-testifying expert in support of or against U. S. Steel; and

      vi.     shall be submitted for public notice and comment prior to any commitment of funds.

c.     The terms and conditions set forth in Paragraph 15(a) and 15(b) are material to each Recipient's receiving funds pursuant to this Consent Decree.  Therefore, as a prerequisite to receiving funds pursuant to this Consent Decree, each Recipient shall respectively execute a copy of the Memorandum of Understanding attached to this Consent Decree as Appendix A (Jefferson Regional Foundation) and Appendix B (Allegheny County through the Allegheny County Department of Economic Development).

d.     ACHD shall be the party responsible for enforcing, with respect to the Recipients, the terms and conditions set forth in Paragraph 15 of this Consent Decree and the Memoranda of Understanding attached as Appendix A and Appendix B (the "Recipients' Obligations").  To the extent that any party believes that ACHD has failed or is failing to ensure that the Recipients comply with the Recipients' Obligations, or that the Recipients are not complying or have not complied with the Recipients' Obligations, the Parties shall promptly meet and confer in an attempt to resolve the dispute.  If the Parties' meet and confer is unsuccessful, any party may immediately seek relief, including injunctive relief, from the Court, without complying with and irrespective of the dispute resolution procedures in Section IX (Dispute Resolution).

e.     U. S. Steel shall not declare as a tax deduction the Civil Penalty, the Additional Settlement Payment, or any stipulated penalties paid pursuant to this Consent Decree.  Any public statement made by U. S. Steel in any press release, in any oral or written material promoting U. S. Steel's environmental or charitable practices or record, or in U. S. Steel's Annual Reports, that makes reference to U. S. Steel's provision of funds to the Recipients in accordance with  Paragraph 15 shall include the following language: "Funding of this project or organization was made by U. S. Steel pursuant to the settlement of a Clean Air Act citizen suit brought by PennEnvironment and Clean Air Council, and joined by the Allegheny County Health Department."

## VII. **STIPULATED PENALTIES**

16.     In the event that there is a Shutdown or Bypass of Control Room 2 or Control Room 5 that results in an exceedance of the 25 Grains Limit (as set forth in Paragraph 13), regardless of the cause of Shutdown or Bypass of Control Room 2 or Control Room 5, U. S. Steel shall, within 30 days of the conclusion of the Shutdown or Bypass of Control Room 2 or Control Room, calculate and report to Plaintiffs and ACHD the amount of Tons of Sulfur Dioxide Emissions for

each Calendar Day of Shutdown or Bypass on which the 25 Grains Limit is exceeded, and, upon

Written Demand by ACHD as set forth below, pay a stipulated penalty as specified below and by

Paragraph 17:

| Calendar Day of Shutdown or Bypass | Stipulated Penalty Amount | | |
|---|---|---|---|
| | Less than 20 Tons of Sulfur Dioxide Emissions / day | Between 20 – 40 Tons of Sulfur Dioxide Emissions / day | More than 40 Tons of Sulfur Dioxide Emissions / day |
| 1st day of exceedance of 25 Grains Limit | $5,000 | $10,000 | $20,000 |
| 2nd – 5th day of exceedance of 25 Grains Limit | $10,000 | $20,000 | $40,000 |
| 6th day of exceedance of 25 Grains Limit and each day of exceedance thereafter | $25,000 | $40,000 | $75,000 |

17.     For any Calendar Day of Shutdown or Bypass on which there is also a validated

exceedance of the Sulfur Dioxide Primary NAAQS recorded by the Liberty or North Braddock

ambient air quality monitors maintained by ACHD, the corresponding stipulated penalty from the

above table shall be increased by 50% for that day without need of any proof that the Shutdown

or Bypass of Control Room 2 or Control Room 5 caused or contributed to the exceedance; such

enhanced penalty amount shall be due solely to the Shutdown or Bypass of Control Room 2 or

Control Room 5 having occurred on the same Calendar Day as an exceedance of the Sulfur Dioxide

Primary NAAQS.

18.     Each non-consecutive Calendar Day of Shutdown or Bypass constitutes a new

event that will be considered as the 1st day of exceedance of the 25 Grains Limit for purposes of

stipulated penalty calculation.

19.     Stipulated penalties under Paragraph 16 shall begin to accrue on the first Calendar Day of Shutdown or Bypass, and shall continue to accrue according to the schedule in Paragraph 16 until the conditions specified in Paragraph 16 triggering liability for stipulated penalties have ceased.

20.     Notices. Within one hour of the start of a Shutdown or Bypass of Control Room 2 or Control Room 5, U. S. Steel shall submit a breakdown report, as required pursuant to Article XXI, Section 2108.01(b) of the Allegheny County Health Department's Rules and Regulations, to ACHD, with a copy sent to Plaintiffs within two business days. Beginning seven days after the start of a Shutdown or Bypass of Control Room 2 or Control Room 5, U. S. Steel shall submit weekly reports to Plaintiffs and ACHD detailing the calculated Tons of Sulfur Dioxide Emissions for each Calendar Day of Shutdown or Bypass of Control Room 2 or Control Room 5 until the Shutdown or Bypass of Control Room 2 or Control Room 5 ends and compliance with the 25 Grains Limit is achieved. U. S. Steel shall notify ACHD in writing within 24 hours after the end of the Shutdown or Bypass of Control Room 2 or Control Room 5, with a copy sent to Plaintiffs within two business days.

21.     ACHD shall provide its Written Demand for stipulated penalties within 30 days of U. S. Steel's written notification to ACHD of the end of the Shutdown or Bypass of Control Room 2 or Control Room 5 as required by Paragraph 20, or as soon thereafter as validated and QA/QC SO2 monitoring data for the period of the Shutdown or Bypass is available. Stipulated penalties shall be due and payable within 30 days of U. S. Steel's receipt of a Written Demand from ACHD, unless U. S. Steel invokes the dispute resolution procedures under Section IX (Dispute Resolution) of this Consent Decree within the 30-day period. Stipulated penalties pursuant to this Paragraph shall continue to accrue as provided in Paragraph 19 notwithstanding the invocation of dispute resolution, but shall instead be paid in accordance with Paragraphs 22 or 23, as applicable.

22.     If the dispute is resolved by mutual agreement of ACHD and U. S. Steel, U. S. Steel shall pay accrued stipulated penalties in accordance with that agreement within 30 days of the date when that agreement is reduced to writing and executed by both U. S. Steel and ACHD (i.e., the effective date of that agreement).  ACHD shall consult with Plaintiffs in connection with agreeing to resolve any such dispute, but ACHD shall have final decision-making authority.

23.     If the dispute is resolved by a decision of the Court, U. S. Steel shall pay accrued stipulated penalties determined to be owed within 30 days of the decision by the Court.

24.     In the event that U. S. Steel fails to complete the permanent idling of Battery 15 or the Control Room 5 Axi Compressor Redundancy project and/or Control Room 1 High Pressure Steam Redundancy project by the required deadlines (or by any agreed-upon extension to deadlines as a result of Force Majeure or mutual agreement of the Parties), U. S. Steel shall pay a stipulated penalty of $10,000 for each seven-day period (or part of a seven-day period) of delay until the project is certified to be completed.  Such penalties shall be due and payable 30 days after ACHD serves upon U. S. Steel a Written Demand, unless U. S. Steel invokes the dispute resolution procedures under Section IX (Dispute Resolution) of this Consent Decree within the 30-day period.  Stipulated penalties pursuant to this Paragraph shall continue to accrue as provided in Paragraph 19 notwithstanding the invocation of dispute resolution, but shall instead be paid in accordance with Paragraphs 22 or 23, as applicable.  No such penalties will be assessed in relation to the Control Room 5 Axi Compressor Redundancy or Control Room 1 High Pressure Steam Redundancy projects in the event that U. S. Steel proposes and ACHD approves alternative project(s) in accordance with Paragraph 12.  The stipulated penalties set forth in this Paragraph will apply to any such project(s) proposed by U. S. Steel and approved by ACHD in accordance with Paragraph 12.

25.     All stipulated penalties paid by U. S. Steel under Section VII shall be paid via wire transfer to the Allegheny County Clean Air Fund in accordance with instructions provided to U. S. Steel by ACHD.

26.     In paying any stipulated penalties, U. S. Steel shall include a transmittal letter stating that the payment is for stipulated penalties and for which violation(s) the penalties are being paid.  U. S. Steel shall simultaneously send notice of such stipulated penalty payment to the email addresses in Section XIV (Notices).

27.     If U. S. Steel fails to pay stipulated penalties according to the terms of this Consent Decree, U. S. Steel shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed as preventing Plaintiffs and ACHD from seeking any remedy otherwise provided by law for U. S. Steel's failure to pay any stipulated penalties.

28.     The payment of penalties and interest, if any, shall not alter in any way U. S. Steel's obligation to complete the performance of the requirements of this Consent Decree.

## VIII. <u>FORCE MAJEURE</u>

29.     "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of U. S. Steel, of any entity controlled by U. S. Steel, or of U. S. Steel's contractors, which delays or prevents the performance of any obligation under this Consent Decree, despite U. S. Steel's best efforts to fulfill the obligation; provided, that Force Majeure is not applicable to a Shutdown or Bypass of Control Room 2 or Control Room 5, or to U. S. Steel's obligation to pay stipulated penalties under this Consent Decree resulting from a Shutdown or Bypass of Control Room 2 or Control Room 5.  The requirement that U. S. Steel exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent

possible. "Force Majeure" does not include any labor dispute or U. S. Steel's financial inability to perform any obligation under this Consent Decree.

30.    If any event (other than a Shutdown or Bypass of Control Room 2 or Control Room 5) occurs or has occurred that may delay the performance of any obligation under this Consent Decree, for which U. S. Steel intends or may intend to assert a claim of Force Majeure, U. S. Steel shall provide to Plaintiffs and ACHD written notice within ten days of when U. S. Steel first knew that the event might cause a delay. This written notice shall include: (i) an explanation and description of the reasons for the delay; (ii) the anticipated duration of the delay; (iii) all actions taken or to be taken to prevent or minimize the delay; (iv) a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; (v) U. S. Steel's rationale for attributing such delay to a Force Majeure event; and (vi) a statement as to whether, in the opinion of U. S. Steel, such event may cause or contribute to an endangerment to public health or welfare, or the environment. U. S. Steel shall include with any such written notice all available documentation supporting the claim that the delay was attributable to a Force Majeure event. U. S. Steel shall be deemed to know of any circumstance of which U. S. Steel, any entity controlled by U. S. Steel, or U. S. Steel's contractors knew or should have known. Failure to comply with the above requirements shall preclude U. S. Steel from asserting any claim of Force Majeure for that event. However, if U. S. Steel can demonstrate to the satisfaction and discretion of ACHD that its failure to provide written notice as set forth above was excusable, ACHD may, in its discretion, excuse in writing U. S. Steel's failure to provide written notice as set forth above.

31.    If, based on the information provided in Paragraph 30, ACHD agrees that the delay or anticipated delay of the performance of any obligation under this Consent Decree (other than an obligation to pay stipulated penalties resulting from a Shutdown or Bypass of Control Room 2 or Control Room 5) is attributable to a Force Majeure event, the time for performance of the obligation(s) under this Consent Decree that are affected by the Force Majeure event will be

extended by ACHD for such time as is necessary to complete such obligation(s). An extension of the time for performance of any obligation(s) affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation. ACHD will notify U. S. Steel in writing of the length of the extension, if any, for performance of the obligation(s) affected by the force majeure event.  ACHD shall consult with Plaintiffs in connection with determining whether any such delay is attributable to a Force Majeure event, but ACHD shall have final decision-making authority.

32.    If ACHD does not agree with U. S. Steel that the delay or anticipated delay has been or will be caused by a Force Majeure event, ACHD will notify U. S. Steel in writing of its decision.  ACHD shall consult with Plaintiffs in connection with determining whether any such delay is attributable to a Force Majeure event, but ACHD shall have final decision-making authority.

33.    If U. S. Steel elects to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution) in relation to this Section, it shall do so no later than 30 days after receipt of ACHD's notice. In any such proceeding, U. S. Steel bears the burden of demonstrating by a preponderance of the evidence that (i) the delay or anticipated delay has been or will be caused by a Force Majeure event, (ii) the duration of the delay or the extension sought was or will be warranted under the circumstances, (iii) best efforts were exercised to avoid and mitigate the effects of the delay, and (iv) U. S. Steel complied with the requirements of this Section. If U. S. Steel meets that burden, the delay at issue will be deemed not to be a violation by U. S. Steel of the affected obligation of this Consent Decree.

## IX. DISPUTE RESOLUTION

34.    Unless otherwise expressly provided for in this Consent Decree, the Dispute Resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this Consent Decree.

35.     Informal Dispute Resolution. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when the aggrieved Party or Parties sends the other Parties a written Notice of Dispute. Such Notice of Dispute shall clearly state the contested matter. The period of informal negotiations shall not exceed 30 days from the date the dispute arises, unless that period is modified by written agreement by all Parties. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by ACHD shall be considered binding unless, within 30 days after the conclusion of the informal negotiation period, one or more of the remaining Parties invokes the Judicial Dispute Resolution procedures, as set forth below.  ACHD shall consult with Plaintiffs in connection with advancing its position, but ACHD shall have final decision-making authority.

36.     Judicial Dispute Resolution.  Any Party may seek judicial review of the dispute by filing with the Court and serving on the remaining Parties, in accordance with Section XIV (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within 30 days after the conclusion of the informal dispute resolution period. The motion shall contain a written statement of the aggrieved Party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation, or affidavit; set forth the relief requested; and include a proposed case management order setting forth any applicable deadlines, as appropriate, necessary to promptly resolve the dispute and ensure orderly implementation of the Consent Decree.

37.     The remaining Parties shall file a written response to the motion within 30 days of receipt of the filed motion. The aggrieved Party may file a reply memorandum within 15 days of receipt of the filed response.

38.     Any of the deadlines set forth in this Section may be modified by agreement of the Parties or leave of Court.

39.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, with payment placed in escrow pending resolution of the dispute.  If U. S. Steel does not prevail on the disputed issue, stipulated penalties shall be released from escrow and paid to the "Allegheny County Clean Air Fund," and U. S. Steel shall pay any additional accrued stipulated penalties to the "Allegheny County Clean Air Fund," within 30 days of the date the dispute is resolved.

## X. INFORMATION RETENTION

40.     U. S. Steel shall retain all non-identical copies of all documents, records, and other information (including documents, records, or other information in electronic form) in its possession or control that directly relate to U. S. Steel's performance of its obligations under this Consent Decree. This information retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures. At any time during this information-retention period, upon request by the ACHD or Plaintiffs, U. S. Steel shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

41.     Privileged and Business Confidential Documents. In response to a request for documents, records, or other information pursuant to this Section:

        a.      U. S. Steel may assert that all or part of a certain documents, records, or other information is privileged or protected as provided under the attorney-client privilege or any other privilege recognized by federal law. If U. S. Steel asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of each author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the contents of the document, record, or information; and (6) the privilege or protection asserted by U. S. Steel.

If a claim of privilege or protection applies only to a portion of a document, record, or information, it shall be provided to the requesting Party in redacted form to mask the privileged or protected portion only. U. S. Steel shall retain all documents, records, and information that it claims to be privileged or protected until the requesting Party has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved.

      b.    U. S. Steel may also assert business confidentiality claims covering part or all of the documents, records, and information required to be provided under this Section to the extent permitted by and in accordance with Article XXI, Section 2101.07(d) of the Allegheny County Health Department's Rules and Regulations and 65 P.S. Chapter 3A *et seq.* (Right to Know Law). U. S. Steel shall substantiate confidentiality in accordance with Article XXI, Section 2101.07(d)(4) as to any information that U. S. Steel seeks to protect as business confidential.

      c.    U. S. Steel may make no claim of privilege or protection regarding: (1) any monitoring data or monitoring records; or (2) any final report that must be submitted pursuant to this Consent Decree (other than claims of business confidential information).

    42.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by ACHD pursuant to applicable federal, state, or local laws, regulations, or permits, nor does it limit or affect any duty or obligation of U. S. Steel to maintain documents, records, or other information imposed by applicable federal, state, or local laws, regulations, or permits.

## XI. <u>EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS</u>

    43.    This Consent Decree fully resolves the civil claims of the ACHD and Plaintiffs, for all violations that were or could have been alleged by Plaintiffs and the ACHD in the above-captioned matter relating to the December Fire or the June or July Incidents.

    44.    The ACHD and Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree. This Consent Decree does not limit the rights of the

ACHD to obtain penalties or injunctive relief under the CAA or implementing regulations, or under other federal, state, or local laws, regulations, or permit conditions, except as expressly specified in Paragraph 43. The ACHD further reserves all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, any Facility covered by this Consent Decree, whether related to the violations addressed in this Consent Decree or otherwise.

45.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations. U. S. Steel is responsible for achieving and maintaining compliance with all applicable federal, state, and local laws, regulations, and permits; and U. S. Steel's compliance with this Consent Decree shall be no defense to liability in any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The ACHD does not, by its consent to the entry of this Consent Decree, warrant or aver in any manner that U. S. Steel's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, 42 U.S.C. § 7401 *et seq.*, or with any other provisions of federal, state, or local laws, regulations, or permits.

46.     This Consent Decree does not authorize any persons other than the signatories to this Consent Decree to use the entry of this Consent Decree, or any statements or terms contained within, in any other matter or proceeding.

47.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XII. COSTS

48.     Except as set forth in Section XIII (Settlement Payment for Plaintiffs' Costs of Litigation), the Parties shall bear their own costs of this action, including attorneys' fees.

## XIII. SETTLEMENT PAYMENT FOR PLAINTIFFS' COSTS OF LITIGATION

49.     Within 30 days after the Effective Date, U. S. Steel shall pay the amount of $3,000,000 in full and complete settlement of Plaintiffs' claim for reasonable costs of litigation in this action (including reasonable attorney and expert witness fees) to Plaintiffs' counsel. Payment shall be made to the National Environmental Law Center ("NELC") in accordance with instructions provided by NELC and via wire transfer or another method agreed to by the Parties. Plaintiffs hereby release and forever discharge U. S. Steel from any and all claims for (i) past costs of litigation; and (ii) all future costs related to implementation of this Consent Decree.

## XIV. NOTICES

50.     Unless otherwise specified in this Consent Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they must be made in writing and sent by mail or email, addressed as follows:

| | |
|---|---|
| To the ACHD: | Allason Holt, Program Manager<br>836 Fulton Street<br>Pittsburgh, PA 15233<br>allason.holt@alleghenycounty.us |
| To U. S. Steel: | Director, Environmental Control – Mon Valley Works<br>United States Steel Corporation – Clairton Plant<br>400 State Street, MS 71<br>Clairton, PA 15025 |
| To Plaintiffs: | Matthew Donohue<br>National Environmental Law Center<br>294 Washington Street, Suite 500<br>Boston, Massachusetts 02108<br>mdonohue@nelc.org, admin@nelc.org |

51.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

52.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, in paper or electronic form, unless otherwise provided in this Consent Decree or by mutual

agreement of the Parties in writing.  Any failure by U. S. Steel to provide any notification, submission, or communication to Plaintiffs required by this Consent Decree shall not result in the imposition of a monetary penalty.

## XV. <u>INTERESTS OF UNITED STATES</u>

53.     On the date this Consent Decree is filed with the Court, Plaintiffs shall concurrently serve a copy of this Consent Decree on the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region III, and the United States Department of Justice, consistent with the requirements of 33 U.S.C. § 1365(c)(3) and 40 C.F.R. § 135.5.

## XVI. <u>EFFECTIVE DATE</u>

54.     The Effective Date of this Consent Decree is the date upon which the approval of, or grant of motion to enter, this Consent Decree is recorded on the Court's docket.

## XVII. <u>RETENTION OF JURISDICTION</u>

55.     This Court shall retain jurisdiction over this case until termination of this Consent Decree pursuant to Section XIX (Termination), for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Sections IX (Dispute Resolution) and XVIII (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree, except for processing permit applications and other applications for authorization or approval and challenges to decisions regarding such applications or as otherwise set forth herein.

## XVIII. <u>MODIFICATION</u>

56.     Except as otherwise specified in this Consent Decree, the terms of this Consent Decree may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.

57.     Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section IX (Dispute Resolution). The Party seeking the modification bears the burden

of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XIX. **TERMINATION**

58.     This Consent Decree shall terminate upon U. S. Steel's certification to the Court and to Plaintiffs and ACHD that it has made all payments required pursuant to Paragraphs 14, 15, 16, 17, and 49, and satisfied its performance obligations pursuant to Paragraphs 10 through 12, provided that U. S. Steel shall remain liable for payment of (or resolution of any dispute over) any stipulated penalties still outstanding as of the date of such certification.

## XX. **SIGNATORIES/SERVICE**

59.     Each undersigned representative of the Parties certifies that they are fully authorized to enter into the terms and conditions of this Consent Decree and, as applicable, the Memoranda of Understanding attached hereto and to execute and legally bind the Party they represent to those documents.

60.     ACHD further certifies that the County of Allegheny is acting by and through ACHD with respect to the Memoranda of Understanding attached hereto, ACHD is fully authorized to legally bind the County of Allegheny to the terms and conditions of those documents, and the County of Allegheny is legally bound to the terms and conditions of those documents.

61.     This Consent Decree may be signed in counterparts, and its validity may not be challenged on that basis.

62.     U. S. Steel shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on its behalf with respect to all matters arising under or relating to this Consent Decree. U. S. Steel agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons.

## XXI. <u>INTEGRATION</u>

63.     This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree. Other than deliverables that are subsequently submitted and approved pursuant to this Decree, the Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this Consent Decree.

## XXII. <u>FINAL JUDGMENT</u>

64.     Upon approval and entry of this Consent Decree by the Court, this Consent Decree constitutes a final judgment of the Court as to the Parties regarding all claims that were or could have been alleged by Plaintiffs and ACHD relating to the December Fire, the June Incident, and the July Incident.

Judgment is hereby entered in accordance with this Consent Decree and Order this 26Th day of _March_ , 2024.

W. Scott Hardy
United States District Judge

AGREED AND CONSENTED TO:

FOR PLAINTIFF PENNENVIRONMENT, INC.:

David Masur

Executive Director
PennEnvironment, Inc.

Date: 1/29/24

FOR PLAINTIFF CLEAN AIR COUNCIL:

Date:  January 19, 2024

Alex Bomstein
Legal Director
Clean Air Council

FOR PLAINTIFF-INTERVENOR ALLEGHENY COUNTY HEALTH DEPARTMENT:


Date: _January 24, 2024_

Patrick Dowd
Acting Director
Allegheny County Health Department

FOR DEFENDANT UNITED STATES STEEL CORPORATION:

Date: 1-26-2024

Name: KURT BARSHICK

Title: VICE PRESIDENT - U.S. STEEL
MON VALLEY WORKS

Address: IRVIN PLANT - P.O. BOX 878
DRAVOSBURG, PA 15034

Phone: 412-675-2600